851 A.2d 19 (2004)
370 N.J. Super. 171
RALEIGH AVENUE BEACH ASSOCIATION, Plaintiff-Appellant,
v.
ATLANTIS BEACH CLUB, INC., Defendant-Respondent, and
Seapointe Village Association, Lower Township Police Department, Defendants, and
The State of New Jersey, Defendant-Appellant.
Atlantis Beach Club, Inc., Plaintiff-Respondent,
v.
Tony Labrosciano, as an individual and representative, Lower Township, Defendants, and
The State of New Jersey, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 2004.
Decided June 3, 2004.
*21 Stuart J. Lieberman, Princeton, argued the cause for appellant Raleigh Avenue Beach Association (Lieberman & Blecher, attorneys; Mr. Lieberman, on the brief).
Brian Weeks, Deputy Attorney General, argued the cause for appellant State of New Jersey (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Mr. Weeks, on the brief).
Gerald J. Corcoran, Pleasantville, argued the cause for respondent Atlantis Beach Club, Inc. (Youngblood, Corcoran, Lafferty, Hyberg & Waldman, attorneys; Chad M. Sherwood, on the brief).
Andrew J. Provence, Newark, argued the cause for amici curiae The American Littoral Society, Inc., and Raritan Baykeeper, Inc. (Ansell Zaro Grimm & Aaron, attorneys; Gordon N. Litwin, of counsel and on the brief; Mr. Provence, on the brief).
Daniel A. Clarkin, Third Year Law Student (Thomas A. Borden, Newark, Supervising Attorney), argued the cause for amicus curiae Citizens' Right to Access Beaches, Inc. (Robin Greenwald, Director, Rutgers Environmental Law Clinic, attorney; Carter H. Strickland, Jr., on the brief).
Before Judges KING, LINTNER and LISA.
*20 The opinion of the court was delivered by LINTNER, J.A.D.
These two consolidated cases arise from a final judgment of the Chancery Division declaring certain beach and ocean properties owned by Atlantis Beach Club (Atlantis) subject to the public trust doctrine but limiting the public's vertical (perpendicular *22 to the ocean) and horizontal (parallel to the ocean) access to Atlantis's beach property. Although the judge did not place any limitations on the public's use of the ocean area, he permitted Atlantis to set a fee for such use subject to approval by the Department of Environmental Protection (DEP). He ordered DEP's approval to be based on a fee structure "commercially reasonable under all of the relevant circumstances."
The central issue to be decided here is to what extent, if any, can the public's right to horizontal and vertical access be limited to Atlantis's beach and ocean property given the unusual circumstances of this case. Ancillary issues are: (1) under what circumstances can a fee be charged by Atlantis to members of the public; (2) the standard to be used for determining the amount of the fee; and (3) whether the DEP should approve the fee in the first instance.
We hold that Atlantis cannot limit vertical or horizontal public access to its dry sand beach area nor interfere with the public's right to free use of the dry sand for intermittent recreational purposes connected with the ocean and wet sand. However, Atlantis may charge a fee to those members of the public who remain upon and use its beach for an extended period providing it cleans the beach, picks up trash regularly, and permits use of its shower facility. Atlantis must also provide customary lifeguard services for members of the public who use the ocean areas up to the high water mark regardless of whether they are just passing through or remaining on the beach area of its property. Finally, Atlantis may charge a fee, subject to DEP approval, that is reasonable and comparable to other beach tag charges in the region. In recognition of Atlantis's private status, such fees shall reflect an amount sufficient to cover costs of operation, which may include a reasonable amount of expenses incurred for management services.
We combine the procedural history with the substantially undisputed relevant facts. The subject property, Block 730.02, Lots 1.02 and 1.03 (the Atlantis property) (Appendix A), is located in Lower Township in what is known as Diamond Beach, which covers a residential area of roughly three blocks by nine blocks. Diamond Beach extends from the southern border of Wildwood Crest at Jefferson Avenue south to the southern border of Atlantis's property. Running eastward from a bulkhead that forms its westerly boundary, Lot 1.02 occupies approximately three acres comprised of dunes, a dry sand beach, and ocean floor. Lot 1.03, which shares the same north and south boundaries, is located to the east of Lot 1.02 and is completely under water at high tide. Both lots were formerly part of a larger tract of land encompassing an area of approximately 7767 acres of which 2450 acres are currently located in the ocean. This larger tract was conveyed by the State of New Jersey by way of a tidelands grant to the Cape May Real Estate Company in 1907.
Two four-story, multiple-unit condominium apartment buildings, La Quinta del Mar (La Quinta) and La Vida del Mar (La Vida), occupy the properties immediately to the west of the bulkhead. La Quinta occupies Block 735.02, Lot 1, and La Vida occupies Block 730.02, Lot 1.01. To the west of La Quinta is the Villa House and La Quinta Towers, both of which contain a significant number of residential units. La Quinta's lot continues along the same southerly boundary line as the Atlantis property while La Vida has the same northerly boundary. Raleigh Avenue's right-of-way runs between La Vida and La Quinta and has its easterly terminus at the bulkhead midway along the westerly boundary of Atlantis's property. *23 A boardwalk pathway flush with the sand (the boardwalk) runs between the condominiums along the Raleigh Avenue right-of-way and continues through the bulkhead where it "doglegs" to the south as it crosses the dunes, terminating at the beach almost in the center of Atlantis's dry beach property. Atlantis maintains the portion of the boardwalk on its property as well as a seasonal gazebo adjacent to the boardwalk at its entrance.[1] The boardwalk and bulkhead are the only permanent structures on the property. According to Atlantis, the boardwalk pathway, which is depicted on a large undated map entitled "Beach and Dune Plan" (Appendix A), was approved by the DEP pursuant to the authority granted it by the Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21 (CAFRA).[2]
On July 31, 1986, developers of La Vida obtained the necessary permit from the DEP under CAFRA. Although the record is somewhat unclear, the subject property was apparently subdivided and acquired by Atlantis or its predecessor in title from either A.T. & L., Inc., developer of La Vida, or a predecessor in title, which sought to develop the tract.[3]
Seapointe Village (Seapointe) is located to the north of La Vida. It is a large condominium and hotel complex comprised of over five hundred residential dwelling units and a one-hundred-room hotel occupying 63.4 acres, including the beach property to the north of Atlantis's property. It provides lifeguards for its beach property and maintains a public restroom facility, outdoor showers, and parking. Seapointe sells seasonal beach badges pursuant to a 1987 approval by the DEP's Division of Coastal Resources. Currently, Seapointe is before the DEP seeking an increase in the amount it is permitted to charge the public for use of its beach facilities. Seapointe does not deny either vertical or horizontal public access to its beach. The land immediately south of Atlantis, which is owned by the Federal Government, is essentially undeveloped and extends to the Cold Spring Inlet.
The Diamond Beach area comprises the only beach property fronting on the Atlantic Ocean located in Lower Township. Although Lower Township does not sell beach badges or regulate who can use its beaches, it controls by ordinance the beach area and the beach approaches within its jurisdiction. The ordinance, in pertinent part, makes it unlawful to:
(A) [play] ... any game which endangers the health and safety of others, including ... use of surfboards ...;
(B) throw, place deposit or leave any bottles, glass, crockery, sharp or pointed article, or thing, paper, refuse or debris of any kind...;
(C) dress, undress or change clothing for bathing or other purpose in any ... *24 vehicle ... regardless of whether the doing thereof is in public view ...;
(D) possess ... or to consume alcoholic beverages within the ... beach and approaches thereof;
(E) revel, disport, or behave in a noisy or boisterous manner ... so as to inconvenience others ... disrupt and disturb the public peace and dignity within ... the beach or approaches thereto;
(F) act in a loud, indecent, obscene, offensive or lascivious manner ...;
(G) engage at any time ... in the practice commonly known as "sleeping in cars."
[Lower Township, N.J., Code § 178-3 (amended 1981).]
Until 1996, the Atlantis beach and ocean property was open to the public. In the summer of 1996, Atlantis started to limit access to its beach and charge a minimum seasonal rate of $300 for six seasonal badges. By the summer of 2002, the fee jumped to $700 for a minimum of eight badges or $10,000 for a life membership. By contrast, Seapointe has no mandatory minimum and currently charges a single individual $2.50 per day, $10 per week, or $40 per season.[4] Atlantis placed a sign on the gate traversing the boardwalk pathway at the bulkhead blocking the Raleigh Avenue entrance to its beach. The sign reads: "FREE PUBLIC ACCESS ENDS HERE/MEMBERSHIP AVAILABLE AT GATE." As a result of condominium development, vertical access to the portion of beach that is the subject of this appeal is limited to the eastern terminus of Raleigh Avenue, Memphis Avenue, and Dune Drive.
According to several certifications filed by residents of La Quinta Towers at 300 East Raleigh Ave, people living in the condominiums adjoining Atlantis's property to the west,[5] who are not members of Atlantis, have to walk west on Raleigh to its intersection with Seaview Avenue then north along Seaview, crossing North Station Avenue where the sidewalk along Seaview ends, to Memphis Avenue or Dune Drive, which ends at the west gate of Seapointe. Walking north along Seaview, the first street providing access to the beach is Dune Drive, then Memphis Avenue. Access to the beach via Dune Drive entails an eight-block walk from Raleigh Avenue, a distance of approximately one-half mile.
The following warning appeared in Atlantis's 2003 Rules and Regulations:
ANYONE ATTEMPTING TO USE, ENTER UPON OR CROSS OVER CLUB PROPERTY FOR ANY REASON WITHOUT CLUB PERMISSION OR WHO IS NOT IN POSSESSION OF A VALID TAG AND AUTHORIZED TO USE SUCH TAG WILL BE SUBJECT TO PROSECUTION, CIVIL AND OR CRIMINAL TO THE FULLEST EXTENT PERMITTED BY LAW INCLUDING ALL COSTS AND LEGAL FEES INCURRED BY THE CLUB.
In a 2003 letter to Diamond Beach residents and Atlantis members, Atlantis stated:
The 2003 Summer Season will soon be upon us. This past year has been one of significant change and uncertainty. Diamond Beach has the unique privilege of having available to its [residents] a private, clean and safe beach.

*25 The beaches are there for your enjoyment, the fact that they are exclusive and private is what prompted many of you to purchase in Diamond Beach to begin with. The price of exclusivity is not cheap.
....
Diamond Beach has seen tremendous growth over the last few years and the CLUB will make every effort to provide the same level of services as in the past to insure the enjoyment of its members. As a Club member you are entitled to use and enjoy the facilities. To that end should you see anything that is not in keeping with Club Rules please report it immediately to our guards.
Notwithstanding all of the above those who possess a valid membership will be protected and the services for which they paid will be guarded. The Club will operate under a zero tolerance policy. Uniformed private security personnel will be on hand to insure against any violations including signing complaints which would require a court appearance. Please read the enclosed updated "RULES AND REGULATIONS."
The 2003 letter also explained that the beach fees must keep up with escalating property values, taxes, insurance, and "other expenses."
Susan Tosti, an Atlantis member, certified that during the third week of July 2003 an Atlantis lifeguard drove on the beach and with the aid of a bullhorn announced that people who were sitting on the wet sand area (the foreshore) were trespassing and robbing members of Atlantis's services. Additionally, many of the residents of La Quinta Towers complained about the need to purchase a minimum of eight beach badges in addition to the restricted access and the necessity of having to walk north to Dune Drive or Memphis Avenue.
Robert A. Ciampitti, the co-owner of Atlantis, certified that the Club provides "security, maintenance, and lifeguard services, together with some recreational activities" and submitted a list of expenses incurred in 2002, which included $25,000 paid to himself and co-owner Silverio Basile for management fees and salaries.[6]
On July 2, 1999, the DEP entered into an Administrative Consent Order (ACO) with Atlantis and Robert A. Ciampitti as the owners of the "oceanfront beach and dune property located at the end of Raleigh Avenue and extending in front of [La Quinta and La Vida] condominiums." The ACO provided in part that it was entered into "to resolve the violation originally cited in the Notice of Violation issued July 7, 1997, for the unauthorized grading and excavation of dunes at this site." On June 3, 2003, the DEP issued an Administrative Order Notice of Civil Administrative Penalty Assessment (AO/NOCAPA) under its CAFRA jurisdiction. The AO/NOCAPA stated, in part, that following a May 23, 2003 compliance evaluation, the DEP found that Atlantis "failed to comply with the [July 2, 1999 ACO], conducted beach maintenance activities without a valid CAFRA General Permit for beach and dune maintenance and excavated/graded dunes without a CAFRA Individual Permit." It further noted that Atlantis had violated CAFRA, specifically N.J.A.C. 7:7-2.1. Within thirty days of receiving the June 3, 2003 AO/NOCAPA, the DEP directed Ciampitti and Atlantis to *26 restore the approximately .4 of an acre of dunes destroyed on May 23, 2003, to the pre-disturbance conditions observed and photographed by the [DEP] on May 8 & 14, 2003. All dune restoration shall be in accordance with the Rules on Coastal Zone Management ( N.J.A.C. 7:7E-3A). The restored sand dunes must be graded to predisturbance elevations consistent with the existing adjacent undisturbed dunes. The installation of sand fencing in a zig-zag pattern is required throughout the restoration area. Planting of the dunes shall be with sprigs of American Beach Grass (Amophila breviligulata) at 2' centers. There must be at least 85% survivability of the planted beach grass for 3 growing seasons.
An appeal of this order is currently pending before the Office of Administrative Law.
Meanwhile, on July 26, 2002, Atlantis filed an Order to Show Cause and Verified Complaint seeking, in pertinent part, to enjoin Tony Labrosciano, a resident of the adjacent condominium development, and members of his class from "trespassing, entering onto and accessing" its property and declaring that it is not required to provide access to or use of any portion of its property.[7] On August 14, 2002, the Raleigh Avenue Beach Association (the Association), consisting of a group of residents who reside on Raleigh Avenue, filed its complaint against Atlantis and the State, seeking a declaration that they are entitled to free public access through the Atlantis property to the beach, along with a sufficient amount of dry sand above the mean high water line, to enable the public to enjoy the beach and related activities. The Association also sought a determination that Atlantis was in violation of the public trust doctrine.[8]
The complaints were consolidated. The State moved for partial summary judgment. On September 19, 2003, the Chancery Division judge entertained oral argument and issued a bench ruling. The ruling was clarified in a September 22, 2003 Memorandum of Decision and further refined after an October 10 telephone conference and later correspondence. A final order was entered on November 3, 2003. The order declared that the public trust doctrine "applied" to Atlantis's property, however, it limited horizontal access for the purpose of entering into or exiting from the ocean (the area below the high water mark) to a three-foot-wide strip of dry sand immediately landward of the mean high water line running in a north-south direction. The judge limited vertical access at the terminus of Raleigh Avenue, precluding public use of the boardwalk path bisecting the dry sand, but required, subject to DEP approval, that a path "insofar as practical" run from the Raleigh Avenue access where it exits upon the dune and runs along the northern boundary of the property to Seapointe. The judge did not provide the exact location, leaving it to the discretion of the DEP within the guidelines set by his order. Atlantis was not permitted to impose a fee upon the public's right to use these limited accesses or the ocean area. However, Atlantis was entitled to charge a "commercially reasonable fee," subject to DEP approval *27 and conditioned upon it providing services such as lifeguards, equipment, or other facilities to persons using the ocean area. The order further provided that Atlantis was not precluded under the public trust doctrine from imposing fees for access to, or use of, any portion of its property by its members. It could also charge a fee for services provided to members of the public in the ocean area. Finally, the order denied Atlantis's application to amend its pleadings to assert a claim against the State for a regulatory taking without prejudice to present such a claim in the future if warranted.
The State filed its notice of appeal on December 15, 2003. The Association filed its brief in support of the State's appeal. Citizens' Right to Access Beaches, Inc., was permitted to join in the State's appeal and file an amicus curiae brief. The American Littoral Society, Inc., and Raritan Baykeeper, Inc., also joined the appeal, filing a common amicus brief.
On April 20, 2004, the State moved before us for a stay of the imposition of beach fees for 2004. Atlantis cross-moved for a remand to the Chancery Division so that the court could make certain factual determinations, specifically, what constitutes a "commercially reasonable" fee. On May 4, 2004, we stayed the imposition of beach fees. We also ordered the return of any beach fees paid after January 1, 2004, and stayed Atlantis's motion for a remand pending appellate argument. Following oral argument, we granted Atlantis's motion for clarification and issued an interim order (Appendix B).
On appeal, Atlantis concedes that its property is subject to the public trust doctrine but asserts that the Chancery Division judge's order precluding the vertical access to the beach pathway at Raleigh Avenue and limiting horizontal access to a strip three feet wide was appropriate. The State, the Association, and the amicus parties contend that the judge erred in limiting the public's right to vertically access and horizontally traverse the beach, which they assert is contrary to the public trust doctrine. They also argue that Atlantis should be restricted to charging reasonable fees for public use of its beaches.
We begin our analysis with the public trust doctrine. Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 471 A.2d 355 (1984), extended the application of the doctrine from publicly owned to privately owned beaches. The origin of the public trust doctrine was explained in Matthews:
In Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 303, 294 A.2d 47 (1972), Justice Hall alluded to the ancient principle "that land covered by tidal waters belonged to the sovereign, but for the common use of all the people." The genesis of this principle is found in Roman jurisprudence, which held that "[b]y the law of nature" "the air, running water, the sea, and consequently the shores of the sea," were "common to mankind." Justinian, Institutes 2.1.1 (T. Sandars trans. 1st Am. ed. 1876). No one was forbidden access to the sea, and everyone could use the seashore "to dry his nets there, and haul them from the sea...." Id., 2.1.5. The seashore was not private property, but "subject to the same law as the sea itself, and the sand or ground beneath it." Id. This underlying concept was applied in New Jersey in Arnold v. Mundy, 6 N.J.L. 1 (Sup.Ct.1821).
[Matthews, supra, 95 N.J. at 316-17, 471 A.2d 355 (footnote omitted).]
Matthews noted that Avon extended the public's right from navigation and fishing uses "`to recreational uses, including bathing, swimming and other shore activities.'" Id. at 321, 471 A.2d 355 (quoting Avon, supra, 61 N.J. at 309, 294 A.2d 47).
*28 Recognizing that "enjoyment of rights in the foreshore is inseparable from use of dry sand beaches," the Matthews Court concluded "some use of the upper sand ... [comes] under the umbrella of the public trust." Id. at 322, 471 A.2d 355. The Court then noted that the public's interest in the privately owned dry sand beach takes two forms: (1) the "right to cross privately owned dry sand beaches in order to gain access to the foreshore;" and (2) "the right to sunbathe and generally enjoy recreational activities." Id. at 323, 471 A.2d 355.
We first examine the applicable principles underlying the public's right to access privately owned dry sand beaches. In 1984, the Matthews Court observed that our beaches are "a unique resource ... irreplaceable" for which the "public demand... has increased with the growth of population and improvement of transportation...." Ibid. "`Oceanfront property is uniquely suitable for bathing and other recreational activities'" and there is a "`growing concern about the reduced availability to the public of its priceless beach areas.'" Id. at 323, 471 A.2d 355 (quoting Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 227-28, 430 A.2d 881 (1981) (internal quotations omitted)). These concerns are of course present to a much greater degree today given the meteoric increases in population and development we have experienced since Matthews.
Matthews points out that access to the foreshore is "depend[ent] upon a right to pass across the upland beach" and "meaningless" without some means of access. Matthews, supra, 95 N.J. at 323, 471 A.2d 355. Matthews concluded that the public must be given reasonable access to the sea. The determination of what is reasonable is dependent upon the "particular circumstances [which] must be considered and examined before arriving at a solution that will accommodate the public's right and the private interests involved." Id. at 324, 471 A.2d 355. The following excerpt from Judge Best's dissent in Blundell v. Catterral, 5 B & Aid. 268, 275, 106 Eng. Rep. 1190, 119 (K.B.1821), as it appears in Matthews, is illustrative of the process to be used and equally applicable to the circumstances here:
Judge Best would have held on principles of public policy "that the interruption of free access to the sea is a public nuisance.... The principle of exclusive appropriation must not be carried beyond things capable of improvement by the industry of man. If it be extended so far as to touch the right of walking over these barren sands, it will take from the people what is essential to their welfare...."
[Matthews, supra, 95 N.J. at 324, 471 A.2d 355.]
Other circumstances relevant in the determination of reasonable access, and applicable here, are the existence of (1) an "undeveloped segment of the shore [that] may have been available and used for access so as to establish a public right of way to the wet sand" or (2) a public street serving an adjacent upland sand area. Id. at 324-25, 471 A.2d 355. With these principles in mind, we turn to Atlantis's arguments.
Atlantis argues that restriction of access at the Raleigh Avenue entrance is reasonable because there is meaningful access through neighboring Seapointe. Atlantis claims that providing its members with services so as to generate a profit is the only beneficial use that it can make of its land. It argues that permitting public access across and use of its upland beach deprives it of the property's sole beneficial use.
*29 The four condominium buildings located adjacent to and along the eastern end of Raleigh Avenue were developed after the early 1980s. Prior to this development, the Raleigh Avenue entrance was unrestricted. Following completion and occupancy of the several condominium units, the residents continued to have unrestricted access until 1996, when Atlantis's predecessor, Club Atlantis,[9] for the first time attempted to restrict access both at Raleigh and along the dry sand beach at its northerly and southerly boundaries. There are no streets to the south providing access to the federal-owned undeveloped beach that is open to the public except for certain times a year when piping plovers are nesting.[10]
The closest perpendicular access to the north is through Seapointe, which is a considerable distance away. The access route over the dune along the northerly boundary of Atlantis's property, as reflected in the final judgment, is a longer, significantly less direct route than that available at the Raleigh Avenue entrance. The boardwalk path located between La Quinta and La Vida occupies a public right-of-way, which all parties acknowledge is the extension of Raleigh Avenue ending at the bulkhead at the westerly boundary of Atlantis's property. The continuation of that same boardwalk, bisecting a portion of Atlantis's dry sand beach, is the only permanent improvement on the Atlantis property. Except for the boardwalk, the remainder of the beach is without permanent structures and remains undeveloped, virtually barren sand.
Atlantis does not provide cabanas, changing facilities, or other improvements necessitating further accommodation to the privacy of its members, which favors limiting horizontal access along the northerly or southerly borders of the property. Likewise, limiting public access at the Raleigh Avenue entrance is not appropriate given the history of long-time access, the large number of nearby residential units, the inconvenience associated with the nearest available perpendicular access to the north, and lack of perpendicular access to the south. Remarkably, these circumstances are virtually identical to those related by the Matthews Court as militating in favor of public access. Perpendicular access at the Raleigh Avenue entrance and unlimited parallel access along the beach reasonably satisfy the public's right to the use and enjoyment of the beach, foreshore, and ocean. We are not persuaded by Atlantis's arguments to the contrary that the circumstances here justify limiting either.
We next consider the extent to which the public is entitled to use the dry sand area under the public trust doctrine. Recognizing that the use of dry sand, like access, is "essential or reasonably necessary for enjoyment of the ocean," the Matthews Court noted:
The bather's right in the upland sands is not limited to passage. Reasonable enjoyment of the foreshore and the sea cannot be realized unless some enjoyment of the dry sand area is also allowed. The complete pleasure of swimming must be accompanied by intermittent periods of rest and relaxation beyond the water edge.
*30 [Id. at 325, 471 A.2d 355 (footnote omitted).]
As it did with access, Matthews concluded that the public has the right to use privately owned upland sand "subject to an accommodation of the interests of the owner." Ibid. To this end, the public "must be afforded reasonable access to the foreshore as well as a suitable area for recreation on the dry sand." Id. at 326, 471 A.2d 355. Again, the precise extent to which privately owned upland sand should be made available for public use is dependent on the circumstances. Ibid. Factors to be considered include "[l]ocation of the dry sand area in relation to the foreshore, extent and availability of publicly-owned upland sand area, nature and extent of the public demand, and usage of upland sand land by the owner." Ibid.
Lower Township does not provide any beach services nor does it own or maintain beaches along the Atlantic Ocean within its borders. Residents and non-residents wishing to use ocean waterfront in Lower Township have no other option but to use beaches that are privately held. The public's intermittent recreational enjoyment of the dry sand area in connection with the use of the foreshore and ocean would not prevent Atlantis's members, who remain on its dry sand areas, from enjoying the services provided. As we pointed out earlier, there are no cabanas, changing facilities, or improvements necessitating further accommodation to the privacy of Atlantis's members. Cf. Hyland v. Borough of Allenhurst, 78 N.J. 190, 393 A.2d 579 (1978). Atlantis does not offer nor does the record establish any facts or reasons supporting the conclusion that the public's intermittent recreational use of the upland sand would interfere with or otherwise prevent it from servicing its members. Instead, Atlantis maintains that it is entitled to use its land to generate profit by providing an exclusive place for its paying clientele. Exclusivity is not a valid reason for limiting use or access. We are satisfied that Atlantis's attempts to limit access to, and use of, its upland sand are hostile to the public trust doctrine and not sustainable on appeal.
At oral argument, Atlantis noted that it provides lifeguard services, beach maintenance, showers, and sale of food and beverages. Atlantis also indicated that it did not object to that part of the Chancery Division order extending, without fee, its lifeguard services to members of the public who use the ocean but do not remain upon its property. Likewise, there is no objection by either the State or amicus parties to Atlantis's right to charge a reasonable fee for those who choose to remain on its upland sand and partake of the services provided as members. Accordingly, we affirm that part of the order to the extent that it requires Atlantis to provide lifeguard services, without charge, to non-member individuals who use the ocean off Atlantis's beach.
The services provided privately by Atlantis fill an important void, given the lack of service provided by the Township. Therefore, the remaining questions we must address are whether Atlantis should be limited to the same extent as a municipality in the determination of the amount and manner in which a fee is to be charged; and if not, what standard should apply, who should be required to pay, and who should regulate the fee.
Initially, we note that the record reflects some confusion concerning the jurisdiction under which the judge ordered Atlantis to obtain DEP approval of its fees. During the telephone conference of October 10, the judge indicated his belief that a permit under CAFRA was needed to create the public pathway northward toward Seapointe. Because he denied access across *31 the beach at Raleigh Avenue and limited horizontal access to a three-foot-wide strip above the high water mark, the judge found that DEP did not have authority to set fees. He stated:
No. Let me try it again, although you're close. The word CAFRA permit is a word of art. And it implicates a certain process, certain filing, certain fees, certain standards, all kinds of matters that I do not believe have anything to do with this case.
I have ruled and reiterate that apart from leaving out the dunes ... [a]nd leaving out the vertical and horizontal access implications of the public trust doctrine, apart from that I have ruled that (a) the public trust doctrine does not apply to this property; and (b) that absent the application of the public trust doctrine, the State has no interest in regulating it.
That means, with respect to access to, use of, structures upon, fees charged for, services provided for, the upland portion of this property, other than the two accesses, the State has no permit authority under CAFRA or otherwise, save for the dunes.... So ... what that tells me is, that if ... Atlantis wants to charge, it needs the permission of the State and it is my assumption that the State will structureor either it already has in place or will structure a place for the receipt and review and reaction to such an application, without the formal CAFRA process. And if it doesn't, it should. And that absent that, I can perceive no authority under CAFRA to regulate the upland portion of the property.
Atlantis contends that N.J.A.C. 7:7E-8.11b does not apply to the present litigation because it is "not part of its previous application under CAFRA for dune and beach maintenance." Atlantis admits, and the record reflects, that it has been before the DEP respecting the boardwalk pathway. Moreover, it is currently before it with respect to dune maintenance. Nevertheless, Atlantis asserts that the DEP is without jurisdiction to act under N.J.A.C. 7:7E-8.11b because it is not currently before it for a beach fee permit. At oral argument before us, Atlantis also claimed that the DEP does not have CAFRA jurisdiction because its property lacks any beach development.
CAFRA was enacted by the Legislature in 1973. In re Egg Harbor Assocs., 94 N.J. 358, 362, 464 A.2d 1115 (1983). Although CAFRA is primarily an environmental protection statute, "the powers delegated to DEP extend well beyond protection of the natural environment." Id. at 364, 464 A.2d 1115. Specifically, CAFRA delegates powers to the DEP and requires it to adopt rules and regulations governing land use within the coastal zone "for the general welfare." Ibid. The legislature amended CAFRA in 1993, significantly expanding its jurisdiction. In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 310, 807 A.2d 198 (App.Div.2002).
Atlantis's argument that the DEP is without jurisdiction here to determine the relevant questions respecting fees is misplaced. First, the public trust doctrine is applicable to the beach access Atlantis attempted to maintain for the exclusive use of its members. Therefore, the judge mistakenly used the wrong reason in arriving at his determination that beach access and its use does not come within the purview of the DEP. More importantly, the boardwalk extension over the dune leading to the beach and the waterfront is maintained by Atlantis and qualifies as development, triggering the DEP's CAFRA jurisdiction over all related issues of *32 use and public access, the specific subjects of this appeal.
N.J.S.A. 13:19-2 covers all new development on a beach or dune and forms the basis for DEP jurisdiction under CAFRA. See Assembly Environment Committee Statement to Senate, No. 1475 (1993). The existence, maintenance, and use of the walkway are covered by the provisions of the rules and regulations adopted by the DEP pursuant to CAFRA. Chapter 7 of the DEP's administrative regulations, Coastal Permit Program Rules, establishes procedures by which the DEP will review applications for permits. N.J.A.C. 7:7-2.1(a)(1) requires a CAFRA permit for "[a]ny development located on a beach or dune." Chapter 7E, Costal Zone Management, establishes rules for "the use and development of coastal resources" in connection with the DEP's review of permit applications under CAFRA. N.J.A.C. 7:7E-1.1. N.J.A.C. 7:7E-3A.1 to -3C.2 covers beach and dune activities respecting dune walk-over and boardwalk structures. N.J.A.C. 7:7E-8.11 specifically deals with public access, providing in pertinent part:
(a) Public access to the waterfront is the ability of all members of the community at large to pass physically and visually to, from and along the ocean shore and other waterfronts.
(b) Coastal development adjacent to all coastal waters, including both natural and developed waterfront areas, shall provide permanent perpendicular and linear access to the waterfront to the maximum extent practicable, including both visual and physical access....
....
4. A fee for access, including parking where appropriate, to or use of publicly owned waterfront facilities shall be no greater than that which is required to operate and maintain the facility and must not discriminate between residents and non-residents....
All establishments ... which control access to tidal waters shall comply with the Law Against Discrimination, N.J.S.A. 10:5-1 et seq.

....
13. Development adjacent to coastal waters shall provide barrier free access within the provisions of public access wherever feasible and warranted by the characteristics of the access area.
N.J.A.C. 7:7E-8.11 is consistent with the principles and objectives requiring open public access to, and use of, the waterfront under the public trust doctrine. Accordingly, we are satisfied that under CAFRA the DEP has jurisdiction to determine what is an appropriate fee to be charged by Atlantis for use of its upland sand, consistent with N.J.A.C. 7:7E-8.11.
Having determined that the DEP has the jurisdiction to regulate the fee sought to be charged by Atlantis, we turn our attention to (1) who should be subject to these fees and (2) the standard to be used for determining the amount. Seapointe's permit sheds some light on these issues. It provides in pertinent part:
The entire beach shall be open to the public. Beach use fees, regulations, and operations shall remain subject to periodic DEP review and approval as specified in Section 7:7E-3.20.
Seapointe is permitted to charge a "beach use fee" that presumably applies to those members of the public who wish to remain on its beach and use the services provided. As we have previously pointed out, under the public trust doctrine, beach use fees cannot limit those members of the public seeking access to, or use of, the ocean and foreshore nor can they limit, under the circumstances here, use of the upland sand *33 for either passage or intermittent recreation connected with use of the ocean.
Fees must be "no greater than that which is required to operate and maintain the facility and must not discriminate between residents and non-residents." N.J.A.C. 7:7E-8.11(b)4. Moreover, there should be a daily, weekly, monthly, and seasonal fee available. Atlantis's current fee structure, requiring a minimum seasonal payment of $700 for up to eight household members, discriminates against individuals and small families by forcing them to pay an amount bearing no rational relationship to the cost associated with individual use of the property. Atlantis's minimum $700 fee makes it impossible for a single individual to use the beach for relaxation or sunbathing. It suggests a tariff or toll designed to limit membership and provide an excessive per capita return for the owners. Simply stated, it is exclusionary. Limiting access by placing an unreasonable economic burden on the public undermines the objectives of the public trust doctrine to the same extent as any physical barrier. "[T]he public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference...." Avon, supra, 61 N.J. at 309, 294 A.2d 47. All members of the public who use the waterfront are entitled to use Atlantis's adjacent upland sand for extended periods and must be afforded a fair opportunity to pay a reasonable single-person fee.
We recognize that, as a private entity, Atlantis's fee schedule should not be limited to the same extent as a public or non-profit organization. See Slocum v. Borough of Belmar, 238 N.J.Super. 179, 191, 569 A.2d 312 (Law Div.1989) (holding that fees "must be reasonable in relation to the municipality's expenses incurred as a result of the beachfront"); see also Secure Heritage, Inc. v. City of Cape May, 361 N.J.Super. 281, 309, 825 A.2d 534 (App. Div.), certif. denied, 178 N.J. 32, 834 A.2d 405 (2003). The notion that lands are to be held in public trust, protected and regulated for the common use and benefit, is incompatible with the concept of profit. However, as trustee, Atlantis should be entitled to expenses actually incurred for reasonable management services in addition to reimbursement for other costs incurred for the services provided. N.J.A.C. 7:7E-8.11(b)4's proscription that fees should be "no greater than that which is required to operate and maintain the facility" does not run afoul of Atlantis's right to recover reasonable costs for administration or management.
In setting an appropriate fee, consideration must also be given to the private nature of similarly situated beaches in the Diamond Beach area. Of course, approval of fees is contingent upon Atlantis continuing to provide customary lifeguard services comparable to that provided by public entities, regular beach maintenance, including cleaning and trash pickup, and outdoor showers. Accordingly, the amount approved by the DEP shall be reasonable and comparable to other beach tag charges in the region, recognizing that it should reflect an amount sufficient to cover costs of operation, including a reasonable amount for administrative services particular to Atlantis. Of course, in the future, Atlantis may apply to the DEP for increases in fees and request an administrative hearing.
We reverse that portion of the final judgment insofar as it limits the public's (1) horizontal access along the northerly and southerly boundaries of Atlantis's property; (2) vertical access at the Raleigh Avenue entrance; and (3) intermittent use of the upland sand for recreational activities connected with use of the foreshore and ocean. The remaining issue of what *34 appropriate fee is to be charged for beach use is remanded to the DEP for determination in accordance with its CAFRA permit jurisdiction. We modify the judge's order requiring setting a standard of "commercially reasonable" as more specifically enunciated in this opinion. The DEP shall expedite its determination and approve a fee schedule, consistent with the guidelines set forth in this opinion, by June 10, 2004, so as not to unduly interfere with the upcoming beach season beginning June 15, 2004.
Reversed in part, modified in part, and remanded to the DEP for further administrative review. *35 *36 
NOTES
[1] At oral argument on appeal, Atlantis represented that the gazebo was recently removed.
[2] We cannot find a specific approval in the voluminous appendix, which does not have a table of contents as required by R. 2:6-1(c). However, for the purposes of this appeal, we accept Atlantis's representation that the "pathway [formed by the boardwalk] was approved by the State in its issuance of a prior CAFRA permit relating to Atlantis's dune system."
[3] Robert Ciampitti and Silverio Basile are co-owners of Atlantis. Ciampitti was the agent and representative of Pacific Four Corporation, a Pennsylvania corporation doing business in New Jersey, which planned in the early 1980's to develop six to eight multi-unit dwellings on the tract that at the time was primarily owned by Ciampitti's brother, Bruce, who acquired the land in 1951 under the name Bruce Nicholas. See United States v. Ciampitti, 583 F.Supp. 483, 485-86 (D.N.J. 1984). As of 1986, La Quinta had already been built.
[4] Seapointe's beach fees were approved by the DEP in 1987. It is currently before the DEP seeking to raise its beach tag fees to $3 per day, $15 per week, and $50 per season.
[5] La Quinta, La Vida, The Villa, and La Quinta Towers.
[6] In a deposition taken on June 11, 2003, Basile acknowledged that he was also the President of the La Vida del Mar Condominium Association. He apparently resigned from his position as president of the condominium association sometime after the deposition was taken.
[7] The complaint is not provided in the appendix, therefore, the relief sought is taken from the State's brief.
[8] Seapointe and Lower Township were named as defendants in the Association's complaint. They are not, however, parties to this appeal. Again, the essential allegations of the complaint are taken from the State's brief because the complaint is not provided in the appendix to this appeal.
[9] Club Atlantis transferred its holdings in the subject property to Atlantis by a November 25, 1997 deed for one dollar.
[10] The State represented at oral argument before us that, except for an area near the Cape May Canal where access is limited for security reasons connected with a loran antenna, the Federal Government permits access to its beach.