930 A.2d 461

SANDRA W. SEIGEL, PETITIONER–APPELLANT, v. THE
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 31, 2007—Decided July 26, 2007.

Before Judges WEFING, C.S. FISHER and MESSANO.

*Kevin J. Coakley* argued the cause for appellant (*Connell Foley*, attorneys; *Agnes Antonian*, on the brief).

*Dean Jablonski*, Deputy Attorney General, argued the cause for respondent (*Stuart Rabner*, Attorney General, attorney; *Michael*

*Haas*, Assistant Attorney General, of counsel; *Mr. Jablonski*, on the brief).

The opinion of this court was delivered by

MESSANO, J.A.D.

Petitioner Sandra Seigel appeals from the April 2, 2006, final agency decision of the Department of Environmental Protection (DEP) that denied her application for a coastal general permit under the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19-1 to –21. We reverse and remand the matter to DEP for further proceedings consistent with this opinion.

I

Petitioner is the owner of Lot 10.04, Block 165, in Manasquan, beachfront property that has been utilized by petitioner and her family as a summer and sometimes year-round residence since 1968 when her parents purchased it. A single family, one and one-half story home was constructed on the property in 1947. The property, one of the largest beachfront lots in Manasquan, is one-hundred and sixty feet deep, running from the street on the west, to the beach front line on the east, and approximately forty-seven feet wide. With the exception of her neighbor's property immediately to the north, petitioner's property is surrounded by fully-developed lots each containing two dwellings, one fronting the ocean and the other directly behind the first and fronting First Avenue. The property is one of only a handful of beachfront properties in all of Manasquan with only one house constructed on the lot.

The existing house, approximately fifty-two feet long and twenty-six feet wide, faces First Avenue and is separated from the street by a ten-foot concrete driveway leading to a garage. Including the wood deck on the back of the home, the entire existing structure covers less than one-half of the lot's length.

Consistent with the surrounding properties, petitioner sought to build a second home that faced the ocean on that portion of the property behind the current house. She intended to occupy it with her aged and ailing mother. She submitted an application to DEP for a CAFRA permit on May 2, 2004. On June 24, 2004, DEP conducted a site inspection of the property and concluded that a portion of the property "eastward of the eastern face of the existing dwelling"—where petitioner intended to build the new home—was located on a dune. *N.J.A.C.* 7:7E–3.16. DEP also determined that the proposed dwelling was located within the coastal high hazard area, *N.J.A.C.* 7:7E–3.18, and denied the application on August 2, 2004. Petitioner appealed and on September 12 and October 18, 2005, a hearing was held before an administrative law judge (ALJ) pursuant to *N.J.S.A.* 52:14F–1.

At the hearing, petitioner identified photographs of her home and the surrounding properties taken over the years. Several of the photographs showed the beach stretching eastward from the rear of her house to the ocean in a generally flat expanse. Petitioner acknowledged, however, that several years ago Manasquan constructed a dune—a "sand fence"—on the easternmost boundary of her property in an effort to separate the beach from the private properties of petitioner and her neighbors. Over the years, the borough added additional sand "further towards the ocean."

Petitioner testified as to her reasons for constructing a second home between the existing house and the dune, an area she described as flat. She noted that her parents had sacrificed for years in order to purchase the property and they had struggled financially to keep it intact and within the family rather than selling off pieces of it for financial gain. Petitioner also testified that given the health status of her mother, the existing house could "not accommodate her." She also noted that one of her neighbor's homes, "four or five houses" from her, had been significantly reconstructed and built into the dune during the prior summer.

Keith Henderson, an attorney, testified as an expert witness on behalf of petitioner. Henderson practiced land use law in Manasquan for over thirty years, and was familiar with the borough's zoning ordinance and the history of petitioner's property and the surrounding lots. Henderson testified that all these beachfront properties at the north end of Manasquan were once owned as one parcel by American Timber Company, and the company permitted its employees to construct modest homes and leased the land to its workers. Eventually, the company sold off the property, but not before subdividing its one large parcel into many smaller ones. This resulted in most of the subdivided lots, though not petitioner's, having two structures on them.

Henderson testified that petitioner's lot contained the required width, and almost twice the square footage necessary, to construct a second house under Manasquan's zoning ordinance. He opined that pursuant to the ordinance petitioner could build a second structure without subdividing the lot, though she would be required to obtain a variance.

Petitioner's environmental expert, David Roth, testified. He conducted a site visit and reached several conclusions regarding petitioner's property and its location within the dune structures.

Roth noted that the property contained significant amounts of gravel. This was evidence, he concluded, that the proposed development area was not "subject to the natural dune process," but, rather, was the result of man-made processes like construction activities. Roth described the general topography of petitioner's property as having "a dune on its eastern edge" that Roth believed was man-made, with an "abrupt slope from its waterward side to its landward side." Roth testified that photographs taken of the area before 1990 show there was no dune on plaintiff's property at all.

Roth also testified that from the landward side of that dune, petitioner's property was "generally flat" and sloped less than one foot over the next seventy-two feet to the eastern edge of the existing home. Roth opined, therefore, that this area of proposed

development was not on a dune because DEP's regulations required a dune to include a "relatively steep" oceanward and landward side.

Roth described the remainder of petitioner's property from the ocean side of the existing house as "slop[ing] down to [the street]." This incline along the street side of the property was more severe, was consistent with all the other properties along the street and was, in Roth's opinion, "an artifact of construction." Roth concluded that petitioner's proposed new house would be built "outside of a dune area," because it was "landward of the toe," or base, "of the dune." Roth also concluded that the new house would not be in the "coastal high hazard area" as defined by DEP's regulations. However, even if it was, Roth opined that petitioner met the criteria for the so-called "infill" exception to the regulations. Given the intense development that surrounded petitioner's property, Roth contended that the construction of a second home would not cause any detriment to the existing dune structures.

DEP's Colleen Keller of the agency's Bureau of Coastal Regulation testified as its expert in coastal planning and regulation. Keller conducted the primary review of petitioner's CAFRA application and had visited the property on various occasions. She testified that the entirety of petitioner's property was a dune, as defined by DEP's regulation, with its landward base at First Avenue. Keller opined that petitioner's home, along with the others along First Avenue, were actually built into the dune structure that existed prior to any of the development along First Avenue.

Keller also concluded that because petitioner's property was entirely on the dune, the proposed development was also within a coastal high hazard area. She further opined that petitioner could not comply with the "infill" exception to the regulation because she had not subdivided the property and because the new structure would not be within one-hundred feet of the surrounding properties.

Keller acknowledged during cross-examination that in DEP's denial letter, which she prepared, in DEP's answers to interrogatories, which she completed, and in her expert report, she stated the dune extended to "the easternmost wall of the existing single-family dwelling," though she claimed that she never intended those statements to convey an opinion that the landward base of the dune was located at that point. Keller also agreed that the minimal slope in the area of proposed development was not "steep," however, she attributed that to petitioner's activities, such as playing volleyball in that area. Lastly, Keller acknowledged that DEP's denial under the coastal high hazard rule was based solely upon the proposed construction being located on a dune, not within the so-called "high-velocity" or "V zone" to which the agency's infill exception applied.

The ALJ rendered his initial decision on February 16, 2006. He recognized that the primary dispute between the parties was "the location of the foot of the most inland slope [of the dune] . . . in other words, the extent of the dune on petitioner's property." He acknowledged that the "regulatory definition of 'dune' is not specific enough to answer the question concerning to what degree a slope no longer comprises the features of a dune." However, he did not believe the regulation's lack of "greater detail or specificity" was reason to find it "or [DEP's] interpretation thereof," "so arbitrary . . . as to render the agency action defective." Instead, the ALJ concluded that "due to the lack of specificity of these rules, the process of determining the extent of a dune should be considered on a case-by-case basis."

He concluded that the regulations' use of the term "relatively steep" did not support Roth's interpretation that the dune face had to have an "abrupt" change in steepness. Rather, the regulation supported DEP's conclusion that the entirety of petitioner's property was a dune because the use of the term "relatively" did not "require rigid adherence to the term" steep, but rather "relaxe[d] the characteristic[']s[ ] requirements." He concluded "nothing in the regulation . . . justif[ies] a finding that when the

slope of a dune changes, then the boundary of the dune necessarily follows."

The ALJ relied upon CAFRA's legislative history as support for the conclusion that petitioner would not suffer any adverse economic impact by the denial. He reasoned that she could simply expand her existing home rather than construct an entirely new one. However, he noted,

The current development of the shoreline in petitioner's neighborhood is such that almost every other landowner has developed the same area on their property that petitioner now seeks in the present case. Thus, there may be a legitimate question as to the purpose and benefit of protecting this specific dune area when the surrounding properties have been, for the most part, developed for years. While the wisdom of the DEP's position in this case may be questionable, such concerns are more appropriate in the context of equity (or policy) and bear little impact on the legal arguments and analysis before this tribunal.

Lastly, the ALJ determined that petitioner's property was in a "coastal high hazard area" because it was entirely on a dune. He concluded that petitioner was not entitled to the "infill" exception to the regulations because she failed to produce "direct evidence ... that the property was ... subdivided prior to July 19, 1993."

The ALJ's initial decision was fully adopted by DEP in its final agency decision of April 2, 2006, which noted that

[t]he Department ... correctly addressed the full downward slope of the dune in question, from an elevation of twenty feet above sea level on the eastern boundary of the petitioner's property to an elevation of ten feet above sea level on the western boundary in determining that the entire property was part of the primary dune system.

DEP noted that the ALJ's initial decision "correctly interpret[ed] the definition of dune in a manner that gives weight to the qualifying words in the regulations by requiring an assessment of each property on a case-by-case basis," striking a "balance" between "the potential economic impact to property owners against the great benefits of protecting ocean and bayfront dunes."

DEP further concluded that "the issue of compliance with the Coastal High Hazard Rule is moot" because petitioner's property was entirely on a dune; nevertheless, the agency determined that petitioner could not comply with the regulatory "infill" exception

to the rule because she failed to demonstrate "the property was shown as a subdivided lot prior to July 1993." DEP denied petitioner's permit application and this appeal ensued.

## II

█ In reviewing decisions of administrative agencies, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." *Burris v. Police Dep't, Twp. of W. Orange,* 338 *N.J.Super.* 493, 496, 769 *A.*2d 1112 (App.Div.2001) (citing *Henry v. Rahway State Prison,* 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980)). The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action. *McGowan v. New Jersey State Parole Bd.,* 347 *N.J.Super.* 544, 563, 790 *A.*2d 974 (App.Div.2002).

█ Our inquiry is restricted to

(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*George Harms Constr. Co. Inc. v. Tpk. Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994).]

Since our review is limited, we do "not substitute [our] own factfinding for that of the agency" and we "defer to the agency" "if the findings of fact are supported by substantial credible evidence in the record and are not so wide off the mark as to be manifestly mistaken." *Tlumac v. High Bridge Stone,* 187 *N.J.* 567, 573, 902 *A.*2d 222 (2006) (citations omitted).

█ Additionally, "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" *Wnuck v. New Jersey Div. of Motor Vehicles,* 337 *N.J.Super.* 52, 56, 766 *A.*2d 312 (App.Div.2001) (quoting *In re Appeal by Progressive Cas. Ins. Co.,* 307 *N.J.Super.* 93, 102, 704 *A.*2d 562 (App.Div.1997)). Nevertheless, we are not bound by the

agency's legal conclusions. *Levine v. State Dep't of Transp.*, 338 *N.J.Super.* 28, 32, 768 *A.*2d 192 (App.Div.2001) (citing *G.S. v. Dep't of Human Servs., Div. of Youth and Family*, 157 *N.J.* 161, 170, 723 *A.*2d 612 (1999)); *see also Mayflower Sec. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Nor do we simply act as a rubber stamp of approval for the agency's decisions. *Henry, supra,* 81 *N.J.* at 579–80, 410 *A.*2d 686.

Petitioner argues that the agency's findings and conclusions are inconsistent with its regulatory definition of a dune. Secondarily, she argues that even if her property is in a coastal high hazard area, she is entitled to the infill exception because she meets the regulatory criteria.

DEP argues that its findings and conclusions are reasonably based upon the evidence adduced at the hearing and that petitioner's entire property is a primary frontal dune as defined by the applicable regulations. It further argues that petitioner has not met the requirements of the regulations regarding the infill exception.

At oral argument, both sides conceded that the sole issue in the case is whether DEP correctly interpreted and applied the dunes rule to the facts of this case. We now comprehend these concessions to mean that both sides agree that consideration of the coastal high hazard and infill exception regulations is unnecessary. In other words, DEP acknowledges that it denied petitioner's application because the development was on a dune, and, hence, by definition, in a coastal high hazard area. DEP concedes that it failed to demonstrate any other basis for concluding that the property is in a coastal high hazard zone.

Likewise, petitioner acknowledges that if the development area is on a primary frontal dune, she must meet the strict requirements for development on a dune—that is "that [she] has no practicable or feasible alternative in an area other than a dune, and that [she] will not cause significant adverse long-term impacts on the natural functioning of the beach and dune system, either individually or in combination with other existing or proposed

structures, land disturbances or activities." Her compliance with the infill exception would be superfluous if she could not meet these stringent criteria. Conversely, if her proposed development is not on a dune, it is not in a coastal high hazard area, and neither the restrictions of the dunes rule, nor the coastal high hazard area regulations, apply.

Thus, the parties acknowledge the sole question presented is whether DEP's determination that petitioner's entire property was a primary frontal dune as defined by its regulations was arbitrary, capricious or unreasonable.

### III

In enacting CAFRA, the Legislature found

that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State.

[*N.J.S.A.* 13:19-2.]

The Legislature balanced, however, its desire to address the adverse environmental effects of coastal area development with recognized economic considerations for those who inhabited the coastal areas, noting CAFRA was intended to also

encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area.

[*Ibid.*]

Each agency decision involving an application for development under CAFRA invokes these "competing policy considerations." *In Re Cape May County Mun. Util. Auth.,* 242 *N.J.Super.* 509, 516, 577 *A.*2d 840 (App.Div.1990).

CAFRA requires DEP to make specific findings before granting a permit, *N.J.S.A.* 13:19-10, and, even if those findings are made, DEP may deny the application if "the proposed development would violate or tend to violate the purpose and intent of this act,"

or "materially contribute to an already serious and unacceptable level of environmental degradation or resource exhaustion." *N.J.S.A.* 13:19–11. CAFRA's broad reach extends beyond protection of the environment in that it "[s]pecifically [ ] delegates powers to the DEP and requires it to adopt rules and regulations governing land use within the coastal zone 'for the general welfare.'" *Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.*, 370 *N.J.Super.* 171, 190, 851 A.2d 19 (App.Div.2004) (quoting *In re Egg Harbor Assocs.*, 94 *N.J.* 358, 364, 464 A.2d 1115 (1983)), *aff'd* 185 *N.J.* 40, 879 A.2d 112 (2005).

We begin our analysis by examining the regulatory framework. *N.J.A.C.* 7:7–7.8(a) provides that a coastal general permit may issue for "the development of a single family home ... landward of the mean high water line." Development under the permit must comply with the dunes rule, *N.J.A.C.* 7:7E–3.16, which prohibits any development on dunes,

> except for development that has no practicable or feasible alternative in an area other than a dune, and that will not cause significant adverse longterm impacts on the natural functioning of the beach and dune system, either individually or in combination with other existing or proposed structures, land disturbances or activities.
>
> [*N.J.A.C.* 7:7E–3.16(b).]

DEP's regulations define a dune as

> [A] wind or wave deposited or man-made formation of sand (mound or ridge), that lies generally parallel to, and landward of, the beach and the foot of the most inland dune slope. "Dune" includes the foredune, secondary or tertiary dune ridges and mounds, and all landward dune ridges and mounds, as well as man-made dunes, where they exist.
>
> [*N.J.A.C.* 7:7E–3.16(a).]

If the development occurs on "the landward slope of a secondary or tertiary dune," *N.J.A.C.* 7:7–7.8(d)1, or "on a dune which is isolated from a beach and dune system by a paved public road, public seawall or public bulkhead, existing on July 19, 1993," *N.J.A.C.* 7:7–7.8(d)2, however, it need not comply with the dunes rule. For purposes of these exceptions, DEP's regulations define "primary frontal dune," "secondary," and "tertiary" dunes.

[P]rimary frontal dune means a continuous or nearly continuous mound or ridge of sand with relatively steep waterward and landward slopes immediately landward of and adjacent to the beach, and subject to erosion and overtopping from high tides and waves during major coastal storms. Secondary and tertiary dunes means the second and third dune mound or ridge, respectively, landward from and adjacent to the primary frontal dune.

[*N.J.A.C.* 7:7–7.8(d)1ii.]

DEP has characterized the dunes rule as a "location rule." *N.J.A.C.* 7:7E–7.1 In addition to the various "location rules," DEP specifically chose to regulate "particular kinds of development" by promulgating "use rules," and also required specific compliance with those regulations. *Ibid.* "Housing," defined as, among other things, "single-family detached houses," *N.J.A.C.* 7:7E–7.2(a), is a permitted use subject to standards promulgated in *N.J.A.C.* 7:7E–7.2(e)2.

In the use rules, DEP again chose to more specifically define the various elements of a dune structure in relation to the location of any proposed housing development, exempting the development from the general dunes rule if it is "located on the landward slope of a secondary or tertiary dune," as opposed to a "primary frontal dune," and if it meets other criteria. *Ibid.* At this point in the regulations, DEP defined a "primary frontal dune" as it did earlier in the regulations at *N.J.A.C.* 7:7–7.8(d)1ii. Thus, in regulating the construction of a single-family detached home as a permitted use in a coastal area, DEP decided that development was subject to the dunes rule only if it was located on a "continuous or nearly continuous mound or ridge of sand," with "relatively steep waterward and landward slopes," located "immediately landward of and adjacent to the beach," and "subject to erosion and overtopping from high tides and waves during major coastal storms."

DEP's rationale statement for its housing regulations expresses an attempt to balance competing environmental and economic concerns both as to location and use. *N.J.A.C.* 7:7E–7.2(f)12. We provide some excerpts from the rationale statement.

Single family homes and duplexes are the most prevalent type of development along the developed oceanfront communities of the Jersey Coast.

. . . .

[I]n view of the extensive development that has occurred along the coast and the minimal impacts associated with the development of an individual single family home or duplex, construction of these developments on dunes . . . is acceptable in certain situations.

  . . . .

One single family home or duplex may be constructed on the landward slope of a secondary or tertiary dune where the intervening dune is of sufficient volume to provide protection. . . .

[*Ibid.*]

## IV

Both parties agree that petitioner's property contains a primary frontal dune. Petitioner contends the dune is limited to a discrete ridge of sand, generally along the property's eastern boundary and demarcated by a "relatively steep waterward" slope and a "relatively steep landward" slope. DEP contends that the entire property is a primary frontal dune with a steep waterward slope, then a sharp immediately adjacent landward slope, and then a continuation of that slope gradually over the next nearly one-hundred and sixty feet of petitioner's property.

"Regulations are subject to the same rules of construction as a statute," and "should be construed in accordance with the plain meaning of [their] language" "and in a manner that makes sense when read in the context of the entire regulation." *Medford Convalescent & Nursing Ctr. v. Div. of Med. Asst. and Health Svcs.*, 218 *N.J.Super.* 1, 5, 526 *A.*2d 1087 (App.Div.), *certif. denied,* 102 *N.J.* 385, 508 *A.*2d 247 (1985). "In interpreting a statute courts should avoid a construction that would render 'any word in the statute to be inoperative, superfluous or meaningless, or to mean something other than its ordinary meaning.'" *Bergen Commer. Bank v. Sisler*, 157 *N.J.* 188, 204, 723 *A.*2d 944 (1999) (quoting *In Re Estate of Post*, 282 *N.J.Super.* 59, 72, 659 *A.*2d 500 (App.Div.1995)).

The ALJ's initial decision and DEP's final decision construe the term "relatively" as limiting and modifying the term "steep." Under this construction, DEP need not demonstrate that petition-

er's entire property presented a steep landward slope because if that was intended, the regulation would have simply used the word "steep" with no modifier. While we appreciate this rationale, this construction is inadequate for purposes of a comprehensive interpretation of the regulation because it fails to give adequate meaning to all the terms DEP chose to use in describing a primary frontal dune.

Neither the initial decision by the ALJ nor the final agency decision attaches any particular meaning to the word "relatively" in the context of the regulation. The term means

[I]n a relative manner; in relation or respect to something else; not absolute.
[*Webster's Third New Int'l Dictionary* 1916 (3d ed.1986).]

Synonyms for "steep" include "abrupt," "precipitous," or "sheer." *Id.* at 2234.

We imply from the ALJ's decision that he construed the phrase "relatively steep" as meaning the landward slope of the dune need not be steep in an absolute sense. However, such a construction provides little guidance because it assumes, in the end, that the landward slope of a primary frontal dune is steep relative to, or in relation or respect to, something else.

That something else is never defined in the regulation. Petitioner has not sought to challenge the regulation as being unconstitutionally vague in this regard. *See In Re Adoption of Amendments to N.J.A.C.*, 339 *N.J.Super.* 371, 390, 772 *A.*2d 9 (App.Div. 2001) (holding "challenged [regulatory] language" must be " 'so vague that [a person] of common intelligence must necessarily guess at its meaning and differ as to its application.' ") (quoting *State v. Lashinsky,* 81 *N.J.* 1, 17, 404 *A.*2d 1121 (1989)). We, therefore, decline to directly address that issue.

Nevertheless, we strive to accord a reasonable interpretation to the regulation that still serves the overarching statutory purposes of CAFRA. We conclude, therefore, that the waterward and landward slopes of a primary frontal dune must abruptly incline and decline respectively compared with the rest of the

subject property or with the other properties in the area immediately adjacent to the subject property. This interpretation accords significant protection to primary frontal dunes, as opposed to development on secondary or tertiary dunes or non-dune structures, from development as intended by the regulations, while at the same time allowing for "reasonable development" that will "improve the overall economic position" of coastal inhabitants on other areas adjacent to the primary frontal dune. *N.J.S.A.* 13:19–2.

Considered in this light, we are convinced that the agency erred in concluding that petitioner's entire property was a primary frontal dune. First, the overwhelming percentage of the lot had a very gradual declining slope in elevation from east to west after a sudden, abrupt decline at its easternmost boundary line. This overall slope was not "relatively steep" compared to the sharp waterward side elevation and the sharp landward side decline of a ridge of sand located at the property's eastern boundary—the primary frontal dune as identified by petitioner's expert. In fact, most of this gradual slope occurred well after the point where petitioner sought to erect her second home. Instead, as Roth noted, the abrupt elevation and immediate adjacent decline of this ridge of sand were both "relatively steep"—as required by the regulations—when compared to the entire balance of petitioner's property.

Nor was the topographical decline of petitioner's property relatively steep when compared with any of the surrounding properties. The undisputed testimony from both sides was that the surrounding properties generally had similar sloping along First Avenue. There was no evidence in the record regarding the topography of the area on the western side of that street.

Because petitioner's entire property is not a primary frontal dune as defined by DEP, and because the proposed development will not be on a dune, the restrictions of the dunes rule do not apply. Since the development is not on a dune, the coastal high hazard rule does not apply either.

We find additional support for our conclusion when we consider the fundamental unfairness that would result to this particular petitioner from an application of the dunes rule to this development. We note initially that the rule itself permits development on a dune where there is "no practicable or feasible alternative in an area other than a dune," and where it will not cause "significant adverse longterm impacts on the natural functioning of the beach and dune system." DEP failed to adequately consider either of these factors in making its determination.

In its denial letter, DEP found that "a practicable alternative to the proposed construction ... would be the reconstruction of the existing home ... construction on a lot that is not a dune, the purchase of an existing house on a lot that is not a dune or the reconstruction of an existing house on a lot that is not a dune." This same language was contained in Keller's expert report that was admitted into evidence at the hearing before the ALJ who agreed that petitioner suffered no significant detriment because she could expand the existing house. DEP did not directly address the issue in its final agency decision.

We note that expansion of an existing home in an area subject to CAFRA is regulated by *N.J.A.C.* 7:7–7.9; *see also N.J.A.C.* 7:7E–7.2(f). Pursuant to those regulations, any reconstruction occurring on a dune is exempt from the dunes rule if it meets additional criteria, one of which requires the development to be "located within the footprint of development of the existing single family home ... and/or on the landward side of the existing footprint of development...." *N.J.A.C.* 7:7–9(d)3iii; *see also N.J.A.C.* 7:7–7.2(f)2iii(3).

While the record in this regard was not fully developed, we would note that petitioner's testimony regarding the inadequacy of the existing structure to meet her mother's medical needs was unchallenged. Furthermore, it is undisputed that the "landward side" of petitioner's existing structure consisted of approximately ten feet of concrete driveway. It would appear, therefore, that reconstruction of the home so as to comply with this exception to

the dunes rule presented difficulties that could not be so casually dispatched.

Nor do we believe that the other alternatives DEP proposed, all of which essentially required petitioner to purchase other property, represent "practical or feasible alternative[s]" to petitioner's dilemma.

We are also convinced that DEP failed to adequately consider whether granting petitioner's permit would cause "significant adverse longterm impacts on the natural functioning of the beach and dune system." Although this opinion was contained in rather conclusory language in Keller's report, the ALJ questioned "the wisdom of DEP's position" by recognizing that such adverse consequences were unlikely given the scale of existing development all around petitioner. Even assuming DEP was correct in determining that the entirety of petitioner's property was a primary frontal dune, we are hard-pressed to understand how the erection of this modest home could have a significant adverse impact beyond what has already occurred.

Our Supreme Court has noted that "[a]ny administrative agency in determining how best to effectuate public policy is also limited by applying principles of fundamental fairness." *Dep't of Envtl. Prot. v. Stavola,* 103 *N.J.* 425, 436 n. 2, 511 *A.*2d 622 (1986). "When specific parties are particularly affected by a proposed rule, fair play and administrative due process dictate that an agency must conscientiously concern itself with and make reasonable efforts to accommodate the rights and interests of the affected individual and genuinely account for the individualized effect of its proposed action." *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 345, 426 *A.*2d 1000 (1981) (Handler, J., concurring).

The lack of definitive standards in the regulation as it currently exists, under the unique facts of this case, further exacerbates the fundamental unfairness to this petitioner. *See Stavola, supra,* 103 *N.J.* at 438, 511 *A.*2d 622 (holding in the context of a different CAFRA regulation that the lack of "specific standard[s] results in

confusion to the public and to DEP"). The lack of definition in the regulation may promote "an assessment of each property on a case-by-case basis," a virtue extolled by DEP in its final decision, but it clearly results in the regulations' failure to provide "the public-at-large" with meaningful guidance and predictability in an "important area[ ] of social concern" where DEP's "action[s] . . . have wide application." *Crema v. N.J. Dep't of Envtl. Prot.*, 94 *N.J.* 286, 300, 463 *A.*2d 910 (1983).

We therefore reverse and remand the matter to DEP for further proceedings consistent with this opinion. We do not retain jurisdiction.