879 A.2d 112

RALEIGH AVENUE BEACH ASSOCIATION, PLAINTIFF–RESPON-DENT, v. ATLANTIS BEACH CLUB, INC. F/K/A CLUB ATLAN-TIS ENTERPRISE, DEFENDANT–APPELLANT, AND SEA-POINTE VILLAGE ASSOCIATION AND LOWER TOWNSHIP POLICE DEPARTMENT, DEFENDANTS, AND THE STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

ATLANTIS BEACH CLUB, INC., PLAINTIFF–APPELLANT, v. TONY LABROSCIANO, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED AND TOWNSHIP OF LOWER, DEFENDANTS, AND THE STATE OF NEW JERSEY, DEFEN-DANT–RESPONDENT.

Argued January 19, 2005—Decided July 26, 2005.

*Robert J. Gilson* argued the cause for appellant (*Youngblood, Corcoran, Lafferty, Hyberg & Waldman* and *Riker, Danzig, Scherer, Hyland and Perretti,* attorneys; *Chad M. Sherwood,* on the briefs).

*Stephanie A. Brand,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*Peter C. Harvey,* Attorney General, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Brian Weeks,* Deputy Attorney General, on the brief).

*Stuart J. Lieberman* argued the cause for respondent Raleigh Avenue Beach Association (*Lieberman & Blecher,* attorneys).

*Andrew J. Provence* argued the cause for amici curiae American Littoral Society, Inc. and Raritan Baykeeper, Inc. (*Ansell Zaro Grimm & Aaron,* attorneys; *Gordon N. Litwin,* of counsel).

*Carter H. Strickland, Jr.,* argued the cause for amicus curiae Citizens' Right to Access Beaches, Inc., (*Mr. Strickland,* Staff Attorney, attorney; *Mr. Strickland* and *Susan J. Kraham,* on the letter brief).

Chief Justice PORITZ delivered the opinion of the Court.

This case raises a question about the right of the public to use a 480–foot wide stretch of upland sand beach in Lower Township, Cape May County, owned by respondent Atlantis Beach Club, Inc., and operated as a private club. We hold today that, in the circumstances presented here, and on application of the factors set forth in *Matthews v. Bay Head Improvement Ass'n,* 95 *N.J.* 306, 326, 471 *A.*2d 355, *cert. denied,* 469 *U.S.* 821, 105 *S.Ct.* 93, 83 *L.Ed.*2d 39 (1984), the public trust doctrine requires the Atlantis property to be open to the general public at a reasonable fee for services provided by the owner and approved by the Department of Environmental Protection.

## I.

Atlantis Beach Club, Inc. (Atlantis or Beach Club) is the successor in title to a Riparian Grant, dated January 17, 1907, from the State of New Jersey to the Cape May Real Estate Company. The grant encompassed a large area not relevant to this litigation except for certain submerged land that, in 1907, was located within the bed of Turtle Gut Inlet, a body of water that connected to the Atlantic Ocean. Today, the land is described on the Lower Township Municipal Tax Map as Block 730.02, Lot 1.02. No longer submerged, the lot extends to the mean high water line from a bulkhead running north/south along the western boundary of the property. That western boundary lies to the east of an

unpaved section of Raleigh Avenue (which runs east/west), where-
as the mean high water line serves as the boundary for Lot 1.03,
which is entirely submerged beneath the ocean at high tide; Lot
1.02, however, consists of dry sand beach and protected dunes.
The distance from the bulkhead (the western boundary of Lot
1.02) to the mean high water line is about 342 feet. Persons using
the beach for recreational purposes cross over the bulkhead by
walking on a boardwalk pathway that traverses the dunes and
curves southward to the beach. The dry sand beach area lies
beyond the dunes and extends to the mean high water line.

A pathway runs east/west along the unpaved section of Raleigh
Avenue to the approximate midpoint of the bulkhead and then, as
described, across the bulkhead and through the dunes. The
pathway was approved by the New Jersey Department of Envi-
ronmental Protection (DEP or Department) in a 1986 permit
issued pursuant to the Coastal Area Facility Review Act (CAF-
RA), *N.J.S.A.* 13:19–1 to –21. The CAFRA permit related to the
construction of the La Vida del Mar Condominiums (La Vida), a
four-story, twenty-four-unit condominium structure along Raleigh
Avenue, and required as a condition of condominium construction
public access "down the center of Raleigh Avenue, ... and [by
means of] a timber walkway over the bulkhead to the beach." The
permit also required Department-approved signs marking public
access to be "conspicuously located at the end of [the] Raleigh
Avenue pavement" and maintained by the condominium home-
owners' association for the life of the condominium project.[1]

---

[1] La Vida's 1986 CAFRA permit application lists the owner of Block 730.02,
Lots 1.02 and 1.03, as A.T. & L., Inc., of Norristown, Pennsylvania. In its
Appellate Division brief the State represented that many of the buildings in the
Diamond Beach neighborhood of Lower Township were constructed on property
formerly owned by various of the principals of Atlantis, who may have subdivid-
ed and sold the property now occupied by La Vida. The permit conditions
suggest that in 1986 La Vida controlled/owned Lot 1.02, but we do not know the
extent of the Atlantis owners' involvement in La Vida at that time. We do know
that Silverio Basile, a fifty-percent owner, stated in his deposition that he was
President of the La Vida Condominium Association at least up to June 11, 2003.

As noted, the La Vida building stands immediately to the west of the bulkhead along the western boundary of the Atlantis property. Another four-story multiple unit condominium complex called the La Quinta del Mar sits to the south of La Vida and the path that runs from the end of the pavement on Raleigh Avenue and over the bulkhead. To the west of La Quinta del Mar are the Villa House and La Quinta Towers, both of which contain residential units. Seapointe Village (Seapointe) is located to the north of La Vida and consists of several structures, including a six-story, one-hundred-room hotel, and more than five hundred residential units. Seapointe occupies 63.4 acres, including the beach property to the north of the Atlantis beach.

When the Seapointe property was developed, the DEP, as a condition of its 1987 CAFRA permit, required the beach in front of Seapointe to be open to the public. Under the terms of the permit, Seapointe is allowed to sell daily, weekly, and seasonal beach passes at rates approved by the DEP, although residents can access the area beyond the mean high water line free-of-charge. Public access through Seapointe's beach along the water's edge is also free-of-charge, and beach usage fees, regulations, and operations are subject to continued periodic review and approval by the DEP. Seapointe provides lifeguards on its beach, as well as public restrooms, outdoor showers, and parking facilities. In August 2002 when this litigation began, the rates for use of the Seapointe beach were, per person, $2.50 a day, $10 a week, and $40 a season; however, Seapointe had submitted an application for a fee increase that was pending at that time.

The United States Coast Guard owns the property to the south of the Atlantis beach. That property is closed to the public from

The Appellate Division indicated that the Atlantis beach property was "apparently subdivided and acquired by Atlantis [Robert Ciampitti and Basile] or its predecessor in title from either A.T. & L., Inc., developer of La Vida, or a predecessor in title, which sought to develop the tract." *Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.*, 370 *N.J.Super.* 171, 177–78, 851 A.2d 19 (2004).

April 1 through August 15 to protect the piping plover, an endangered species, during breeding season. Although the Coast Guard beach is unavailable for most of the summer season, the property is open to the public the rest of the year.

Atlantis is located in the Diamond Beach neighborhood, a residential area of approximately three blocks by nine blocks that contains the only beach in Lower Township facing the Atlantic Ocean. In addition to the beach access point on the Atlantis property at the end of Raleigh Avenue, there are two other access points in Diamond Beach north of Atlantis: one at the eastern end of Dune Drive and the other at the eastern end of Memphis Avenue. Access is blocked by condominium buildings located at the terminus of the other streets in the area. According to certifications filed by residents of La Quinta Towers in support of plaintiff Raleigh Avenue Beach Association (Association), the closest free entry to the beach is Dune Drive, a nine-block walk from Raleigh Avenue and a distance of approximately one-half mile. The beach access problem in Lower Township is further compounded by the limited number of parking spaces available in the Diamond Beach neighborhood.

Until 1996, the beach on the Atlantis property was open to the public free-of-charge. In the summer of 1996, however, Atlantis established a private beach club known at the time as Club Atlantis Enterprises. The club limited public access to its beach by charging a fee of $300 for six seasonal beach tags. As of July 2003, a sign posted on the gate [2] at the entrance to the Atlantis beach read: "FREE PUBLIC ACCESS ENDS HERE/MEMBERSHIP AVAILABLE AT GATE." Atlantis's 2003 Rules and Regulations, also posted, provided the following warning:

ANYONE ATTEMPTING TO USE, ENTER UPON OR CROSS OVER CLUB PROPERTY FOR ANY REASON WITHOUT CLUB PERMISSION OR WHO IS NOT IN POSSESSION OF A VALID TAG AND AUTHORIZED TO USE SUCH TAG WILL BE SUBJECT TO PROSECUTION, CIVIL AND OR CRIMI-

---

[2] The gate is apparently at the end of the east/west path bisecting the unpaved section of Raleigh Avenue at or near the bulkhead.

NAL[,] TO THE FULLEST EXTENT PERMITTED BY LAW[,] INCLUDING ALL COSTS AND LEGAL FEES INCURRED BY THE CLUB.

Prior to the commencement of this litigation, the membership fee for new members and members who had joined the beach club in 2002 was set at $700 for the 2003 summer season. Members were entitled to eight beach tags per household.[3] Atlantis also sold "Access Easements" at $10,000 each, paid in cash.[4] Easement holders were required to pay an annual membership fee determined by dividing the actual costs associated with operating the beach club by the total number of members (both easement holders and yearly members) to arrive at the holder's proportionate share. According to a March 14, 2003 letter to members, the payment of membership fees or the purchase of an easement entitled them "to use and enjoy the [club] facilities," which included uniformed private security personnel on club grounds, as well as lifeguards on duty from June 21 through September 1, 2003, seven days a week, between the hours of 10:00 a.m. and 5:00 p.m.

## II.

On June 22, 2002, Tony Labrosciano, a member of the Association, was issued a summons for trespassing when he attempted to leave the wet sand area and walk across the Atlantis property to the eastern terminus of Raleigh Avenue in order to take the most direct route back to his home. On July 26, 2002, Atlantis filed an Order to Show Cause and Verified Complaint against Labrosciano, other unnamed persons, Lower Township, and the State of New Jersey, seeking, among other things, to enjoin Labrosciano and members of his class from "trespassing, entering onto and access-

---

[3] Returning members who had joined Atlantis in 1999 for a five-year term were charged $400 and were entitled to six beach tags per household, whereas returning members who had joined the club in 2000 for a five-year term were charged a $450 renewal fee for the same six beach tags per household.

[4] A financing option was offered whereby a member could make a down payment of $2,000 (plus costs) on the easement, with the principal balance of $8,000 to be paid over five years at an eight-percent interest rate.

ing" the Atlantis property, and declaring that Atlantis is not required to provide the public with access to or use of any portion of its property or the adjacent ocean.

The Association, which consists of individuals who reside on Raleigh Avenue in the Diamond Beach neighborhood, filed a complaint on August 14, 2002 against Atlantis, the Lower Township Police Department, Seapointe Village Association, and the State of New Jersey.[5] The Association claimed that Atlantis was in violation of the public trust doctrine and sought free public access through the Atlantis property to the beach, and to a sufficient amount of dry sand above the mean high water line to permit the public to enjoy the beach and beach-related activities. That Association action was subsequently consolidated with the Atlantis action.[6]

On June 2, 2003, the DEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment (AO/NOCAPA) to Atlantis for conducting CAFRA-regulated activities on its property without obtaining required permits.[7] The DEP had determined, on completion of a May 23, 2003 compliance review, that Atlantis had engaged in prohibited conduct, including excavation of sand dunes and grading of the Atlantis beach, in violation of the CAFRA Coastal Zone Management Rules (*N.J.A.C.* 7:7E–3A.1

[5] Seapointe Village Association and the Lower Township Police Department are no longer parties to this litigation. The DEP is the state entity with regulatory responsibility in this matter.

[6] The complaints filed by Atlantis and the Association were not included in the record before the Court. The information in respect of the complaints has been taken from the State's Appellate Division brief.

[7] A month earlier, on May 8, 2003, the DEP found that the La Vida condominium association, which by its 1986 CAFRA permit had accepted responsibility for the beach access sign and pathway, failed to comply with the signage requirements of the permit. From the record, however, it appears that Basile and Ciampitti, through Atlantis, have had direct control over access to Lot 1.02, at least since 1996. See *supra* at 43 n. 1, 879 *A.2d* at 114 n. 1 regarding Basile's interest in La Vida.

to –3A.5) and a July 2, 1999 Administrative Consent Order, and without the requisite CAFRA General Permit for Beach and Dune Maintenance. The AO/NOCAPA ordered Atlantis to restore the dunes that had been destroyed and to install sand fencing in a zig-zag pattern throughout the restoration area. Two days later, on June 5, 2003, the DEP notified Atlantis that it had not obtained CAFRA permits to erect certain structures on its beach and that the necessary permit applications were to be submitted to the DEP within thirty days.

On or about July 10, 2003, the DEP moved before the trial court for partial summary judgment and dismissal of all claims against it. The Department sought a ruling on the question whether the beach along the Atlantic Ocean in the Diamond Beach area is subject to the public trust doctrine such that an individual can walk along the ocean shore on the Atlantis property without fear of prosecution for trespassing or for a disorderly persons offense. On the question of access, the Department asked the court to defer to the pending administrative proceedings.

On September 19, 2003, the trial court issued a ruling from the bench, followed by both a Memorandum of Decision, dated September 22, 2003, and an Order of Final Judgment, dated November 3, 2003. The court considered and disposed of issues relating to both horizontal and vertical access to the Atlantis beach under the public trust doctrine. More specifically, the court held that the public was entitled to a right of horizontal access to the ocean by means of "a three-foot wide strip of dry sand, immediately landward of the mean high water line and extending from the northern to the southern boundaries of [the Atlantis] [p]roperty, which may be utilized by the public, at no charge, for the purpose of entering into and exiting from" the area located below the mean high water line. The trial court also held that the public was entitled to limited vertical access to the ocean, consisting of a path from the bulkhead through the dunes on the property. Although acknowledging the DEP's authority to regulate the location, structure, and protection of dunes, and therefore, the placement of the

path, the court focused on the limited nature of the public right to vertical access:

> Insofar as is practicable, the path shall exit [the Atlantis] [p]roperty within the portion of the [p]roperty upon which the dunes are located. In no event shall the path cross the remaining portion of the [p]roperty other than along the northern boundary thereof or provide, without Atlantis' consent, public access to any other portion of the [p]roperty, other than . . . [h]orizontal [a]ccess, landward of the mean high water line.

In the court's view, "the Public Trust Doctrine does not apply to permit the Department to regulate the use of the Beach Area."

Finally, Atlantis was prohibited from charging a fee or otherwise restricting the right of the public to horizontal or vertical ocean access. The court determined, however, that the provision of such services as lifeguards, equipment, or other facilities by Atlantis would entitle the Beach Club, on application to and with the DEP's approval, to charge a commercially reasonable fee to members of the public who use the horizontal access to swim in the ocean. The court denied without prejudice the Atlantis application to amend its pleadings so as to assert a regulatory takings claim.

The State and the Association appealed.[8] While the appeal was pending, by a March 9, 2004 letter Atlantis notified its members about the 2004 beach fee schedule. Returning members from 2003 were required, as in the prior year, to pay $700 for eight beach tags, whereas the easement price was increased from $10,000 to $15,000. On April 20, 2004, the State moved before the Appellate Division for a stay of the 2004 beach fees. The Appellate Division granted the State's motion on May 4, ordering that no beach fees could be charged pending oral argument in the matter and until further order of that court. The court also directed Atlantis to return to its members any payments made after January 1, 2004.

---

[8] Citizens' Right to Access Beaches, Inc., the American Littoral Society, Inc., and Raritan Baykeeper, Inc., were permitted to participate in the appeal as *amici curiae*.

On motion by Atlantis for clarification, and after oral argument, the Appellate Division issued an interim order on May 20, 2004. Pending opinion, the court granted "[t]he public ... vertical access to the beach ... upon the boardwalk pathway which currently exists through the dunes on the subject property as an extension of Raleigh Avenue." The panel also found that "[t]he public [had] the right to use all of the dry sand and complete horizontal access to the subject property, including the ocean." Atlantis was allowed to charge a reasonable and comparable fee for the use of its beach pursuant to a DEP-approved fee schedule covering daily, weekly, monthly, and seasonal tags, but only if the beach club provided lifeguard services comparable to municipally-provided services, beach clean-up with regular trash removal, and shower facilities. Atlantis could choose not to issue beach tags or to charge fees for service, in which case public access to the beach and ocean would remain open and free.

On June 3, 2004, the Appellate Division issued its opinion. *Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc.*, 370 *N.J.Super.* 171, 851 *A.*2d 19 (2004). The court reaffirmed the central premise of its Order that "Atlantis cannot limit vertical or horizontal public access to its dry sand beach area nor interfere with the public's right to free use of the dry sand for intermittent recreational purposes connected with the ocean and wet sand." *Id.* at 176, 851 *A.*2d 19. As permitted under the Order, Atlantis could charge a fee to members of the public who remain on and use its beach for an extended period of time, as long as Atlantis cleans the beach, picks up trash regularly, and provides shower facilities. *Ibid.* The panel ruled further that Atlantis was required to provide customary lifeguard services for members of the public who use the ocean areas up to the mean high water line, regardless of whether those individuals remain on the Atlantis beach area or merely pass through. *Ibid.* Reasonable and comparable fees, approved by the DEP, would be allowed in an amount sufficient to cover operating costs, including an amount related to management services. *Ibid.* The court remanded to the DEP the issue of the appropriate fee to be charged for beach use, ordering

the Department to approve a fee schedule by June 10, 2004, so as not to unduly interfere with the beach season beginning June 15, 2004. *Id.* at 194, 851 *A.*2d 19.

On remand, Atlantis submitted an Application for General CAF-RA Permit and, on June 10, 2004, the DEP issued an interim beach badge schedule setting fees at $3 per day, $15 per week, $40 per month, and $55 per season, effective immediately. Shortly thereafter, Atlantis filed a Notice of Petition for Certification and moved before the Appellate Division for a stay pending this Court's review of its Petition. The Appellate Division denied the motion by Order dated July 19, 2004, wherein the court further directed that all non-member beach badges must be transferable, that no photo identification requirement may be associated with non-member badges, and that no liability waiver may be required of anyone seeking a badge. On August 2, 2004, Atlantis moved before this Court for a stay of the Appellate Division's opinion and order pending certification. The Court denied the Atlantis motion on August 13, 2004, and granted certification on September 29, 2004. 181 *N.J.* 548, 859 *A.*2d 693 (2004).

At oral argument before us, counsel for Atlantis conceded vertical access to the ocean by the public from the boardwalk pathway at the terminus of Raleigh Avenue, over the bulkhead and the dunes and across the dry sand area to the ocean. Atlantis maintained its position that persons who are not members of the Beach Club may only walk along the three feet of dry sand that lie landward of the mean high water line, as so held by the trial court, and may not use the dry sand beach beyond that horizontal three-foot strip of sand.

### III.

The law we are asked to interpret in this case—the public trust doctrine—derives from the English common law principle that all of the land covered by tidal waters belongs to the sovereign held in trust for the people to use. *Borough of Neptune City v.*

*Borough of Avon–by–the–Sea,* 61 *N.J.* 296, 303, 294 *A.*2d 47 (1972). That common law principle, in turn, has roots

in Roman jurisprudence, which held that "[b]y the law of nature[,] ... the air, running water, the sea, and consequently the shores of the sea," were "common to mankind." ... No one was forbidden access to the sea, and everyone could use the seashore "to dry his nets there, and haul them from the sea...." The seashore was not private property, but "subject to the same law as the sea itself, and the sand or ground beneath it."

[*Matthews, supra,* 95 *N.J.* at 316–17, 471 *A.*2d 355 (citations and footnote omitted).]

In *Arnold v. Mundy,* 6 *N.J.L.* 1, 53 (E. & A. 1821), the first case to affirm and reformulate the public trust doctrine in New Jersey, the Court explained that upon the Colonies' victory in the Revolutionary War, the English sovereign's rights to the tidal waters "became vested in the people of New Jersey as the sovereign of the country, and are now in their hands." *Arnold, supra,* addressed the plaintiff's claim to an oyster bed in the Raritan River adjacent to his farm in Perth Amboy. *Id.* at 45. Chief Justice Kirkpatrick found that the land on which water ebbs and flows, including the land between the high and low water, belongs not to the owners of the lands adjacent to the water, but to the State, "to be held, protected, and regulated for the common use and benefit." *Id.* at 49, 71.

Early understanding of the scope of the public trust doctrine focused on the preservation of the "natural water resources" of New Jersey "for navigation and commerce ... and fishing, an important source of food." *Neptune City, supra,* 61 *N.J.* at 304, 294 *A.*2d 47. In *Neptune City, supra,* the Court extended public rights in tidal lands "to recreational uses, including bathing, swimming and other shore activities." *Id.* at 309, 294 *A.*2d 47. We invalidated a municipal ordinance that required non-residents of Avon–by–the–Sea to pay a higher fee than the residents of Avon were required to pay to access and use the town's beaches. *Id.* at 310, 294 *A.*2d 47. The Court held:

[A]t least where the upland sand area is owned by a municipality ... and dedicated to public beach purposes, a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible.

[*Id.* at 308–09, 294 *A.*2d 47.]

Later, in *Matthews, supra,* we considered "the extent of the public's interest in privately-owned dry sand beaches," which, we noted, "may [include both] a right to cross [such] privately owned ... beaches in order to gain access to the foreshore ... [and a] right to sunbathe and generally enjoy recreational activities" on the dry sands. 95 *N.J.* at 322–23, 471 *A.*2d 355. We observed that New Jersey's beaches constitute a "unique" and "irreplaceable" resource, subject to increased pressure from population growth throughout the region and improved transportation to the shore. *Id.* at 323, 471 *A.*2d 355. Concerned about the great demand and the limited number of beaches open to the public, we repeated:

> Exercise of the public's right to swim and bathe below the mean high water mark may depend upon a right to pass across the upland beach. Without some means of access the public right to use the foreshore would be meaningless. To say that the public trust doctrine entitles the public to swim in the ocean and to use the foreshore in connection therewith without assuring the public of a feasible access route would seriously impinge on, if not effectively eliminate, the rights of the public trust doctrine.
>
> [*Id.* at 323–24, 471 *A.*2d 355.]

*Matthews* clearly articulates the concept already implicit in our case law that reasonable access to the sea is integral to the public trust doctrine. Indeed, as *Matthews, supra,* points out, without access the doctrine has no meaning. *Id.* at 323, 471 *A.*2d 355.

That leaves the question raised in this case: whether use of the dry sand ancillary to use of the ocean for recreation purposes is also implicit in the rights that belong to the public under the doctrine. *Matthews, supra,* states unequivocally that a "bather's right in the upland sands is not limited to passage ... [and that] [r]easonable enjoyment of the foreshore and the sea cannot be realized unless some enjoyment of the dry sand area is also allowed." *Id.* at 325, 471 *A.*2d 355. Because the activity of swimming "must be accompanied by intermittent periods of rest and relaxation beyond the water's edge," the lack of an area available to the public for that purpose "would seriously curtail and in many situations eliminate the right to the recreational use

of the ocean." *Ibid.* Although the *Matthews* Court did not compare that use of the dry sand to use associated with ancient fishing rights, it did point out that under Roman law, "everyone could use the seashore 'to dry his nets there, and haul them from the sea . . . .' " *Id.* at 317, 471 *A.*2d 355 (quoting Justinian *Institutes* 2.1.1) (T. Sandars trans. 1st Am. ed. 1876) (footnote omitted). It follows, then, that use of the dry sand has long been a correlate to use of the ocean and is a component part of the rights associated with the public trust doctrine.

The factual context in which *Matthews* was decided was critical to the Court's holding. *Neptune City, supra,* had held that the general public must be allowed to use a municipally-owned dry sand beach on equal terms with residents of the municipality. 61 *N.J.* at 310, 294 *A.*2d 47; *see Van Ness v. Borough of Deal,* 78 *N.J.* 174, 179–80, 393 *A.*2d 571 (1978) (holding that a municipality could not limit public use of municipal beach to fifty-foot strip along high water line when Deal residents and property owners were permitted to use entire beach area). *Matthews, supra,* involved a private non-profit entity, the Bay Head Improvement Association (Improvement Association), that owned/leased and operated certain upland sand areas in the Borough of Bay Head for the recreational use of Bay Head residents only. 95 *N.J.* at 314–15, 471 *A.*2d 355. The Improvement Association was closely connected with the municipality, which provided at various points in time, office space, liability insurance, and funding, among other things. *Id.* at 330, 471 *A.*2d 355. That symbiotic relationship, as well as the public nature of the activities conducted by the Improvement Association, led the Court to conclude that the Improvement Association was in reality a "quasi-public body" bound by the *Neptune City* holding. *Id.* at 328, 329, 471 *A.*2d 355.

Although decided on narrow grounds, *Matthews* established the framework for application of the public trust doctrine to privately-owned upland sand beaches. The *Matthews* approach begins with the general principle that public use of the upland sands is "subject to an accommodation of the interests of the owner," and

proceeds by setting forth criteria for a case-by-case consideration in respect of the appropriate level of accommodation. *Id.* at 325–26, 471 *A.*2d 355. The Court's formulation bears repeating here:

Archaic judicial responses are not an answer to a modern social problem. Rather, we perceive the public trust doctrine not to be "fixed or static," but one to "be molded and extended to meet changing conditions and needs of the public it was created to benefit." . . . .

Precisely what privately-owned upland sand area will be available and required to satisfy the public's rights under the public trust doctrine will depend on the circumstances. Location of the dry sand area in relation to the foreshore, extent and availability of publicly-owned upland sand area, nature and extent of the public demand, and usage of the upland sand land by the owner are all factors to be weighed and considered in fixing the contours of the usage of the upper sand.

Today, recognizing the increasing demand for our State's beaches and the dynamic nature of the public trust doctrine, we find that the public must be given both access to and use of privately-owned dry sand areas as reasonably necessary. While the public's rights in private beaches are not coextensive with the rights enjoyed in municipal beaches, private landowners may not in all instances prevent the public from exercising its rights under the public trust doctrine. The public must be afforded reasonable access to the foreshore as well as a suitable area for recreation on the dry sand.

[*Id.* at 326, 471 *A.*2d 355 (citations omitted).]

## IV.

■ We turn now to an application of the *Matthews* factors to the circumstances of this case in order to determine "what privately-owned upland sand area will be available and required to satisfy the public's rights under the public trust doctrine." *Ibid.*

*"Location of the dry sand area in relation to the foreshore":*

The dry sand beach at the center of this controversy extends horizontally 480 feet from the Coast Guard property south of Atlantis to the Seapointe property north of Atlantis, and vertically, from three feet landward of the mean high water line about 339 feet to the dunes adjacent to the bulkhead and the Raleigh Avenue extension. It is easily reached by pedestrians using the path bisecting the Raleigh Avenue extension from the end of the paved roadway to the bulkhead.

*"[E]xtent and availability of publicly-owned upland sand area":*

There is no publicly-owned beach area in Lower Township, although it was represented to us at oral argument that there are public beaches in the "Wildwoods" north of Lower Township. The Borough of Wildwood Crest, immediately north of Lower Township, owns dry sand beach that is used by the public. Seapointe, a private entity, as required by its 1987 CAFRA permit, has made its upland sands available to the public for a "reasonable" fee, approved by the DEP at a level comparable to fees charged by nearby town beaches (in 1987, Cape May City, Avalon, and Stone Harbor beaches). The Coast Guard beach to the south of Atlantis is closed to the public for the better part of the summer season (April 1 through August 15) to protect the endangered piping plover.

*"[N]ature and extent of the public demand":*

The Diamond Beach section of Lower Township is not large (three blocks by nine blocks), and parking is limited but available along the area streets. Local residents whose homes are within easy walking distance of Atlantis are members of the plaintiff Association, through which they have expressed their individual concerns about access and use. That there is enormous public interest in the New Jersey shore is well-known; tourism associated with New Jersey's beaches is a $16 billion annual industry.

*"[U]sage of the upland sand land by the owner":*

The more or less rectangular area of dry sand that constitutes the Atlantis beach has been closed to non-members of Atlantis from the summer of 1996 to May 4, 2004. On May 4, the Appellate Division required open access and use by the public to the entirety of the beach area and permitted reasonable and comparable fees to be approved by the DEP on application by Atlantis. As for the period prior to 1996, the general public used the beach without limitation or fee during the ten years between 1986 and 1996 and, it appears, enjoyed the same open access and use prior to 1986 (although the record is sparse on the issue of prior use). The La Vida condominiums, situated directly to the

west of Atlantis, were constructed in 1986. By the La Vida CAFRA permit, the developer/owner accepted as binding a condition on development making the homeowner's association responsible for public access "to the beach," with adequate signage, for the life of the condominium project. The permit describes the relationship between the La Vida site and the beach as follows:

> The site is adjacent, and provides access points for residents *and the public to the ocean beach*, which is about 220' in width at the site.[9] The proposed development will have minimal impact on the beach, but as required under the policy on Dunes (7:7E–3.21), the remaining dunes must be reconstructed, replanted, and maintained. Provided an acceptable plan is submitted and implemented for dune enhancement and management, and provided walkovers to the beach are provided as discussed under the policies on Dunes (3.21) and Public Access to the Waterfront (8.11), and as required by conditions of this permit, this policy is met. [Emphasis added.]

Although the permit language is not without ambiguity, and the record is not clear in respect of the relationship between the developer/owner of La Vida and the owner of Atlantis, *see supra* at 43 n. 1, 879 *A.*2d at 114 n. 1, it may be inferred from this section of the permit that open access and use was ceded to the public by La Vida. Most telling, the permit describes access to a 220–foot strip of upland sand beach, not the foreshore. It is difficult to imagine that the DEP (or La Vida) anticipated anything other than public use of that area. That argument has not been made by any party, however; we, therefore, will not here consider the permit dispositive on the issue of public use. Suffice it to say that

---

9 "Beach" is defined in the Coastal Zone Management Rules, *N.J.A.C.* 7:7E–1.1 to –8.22, as a

> gently sloping area[ ] of sand or other unconsolidated material, found on all tidal shorelines, including ocean, bay and river shorelines . . ., that extend[s] landward from the mean high water line to either . . . [a] man-made feature . . . such as a retaining structure, seawall, bulkhead, road or boardwalk, . . . or [t]he seaward or bayward foot of dunes, whichever is closest to the bay, inlet or ocean waters.
>
> [*N.J.A.C.* 7:7E–3.22(a) (effective February 3, 1986); *see also N.J.S.A.* 13:19–3 (adopting DEP definition with non-substantive changes by amendment to CAFRA, *L.* 1993, *c.* 190).]

We observe that the upland sand is today wider by some 122 feet, likely due to accretion.

the Atlantis beach was used by the public for many years and that public access and, arguably, public use of 220 feet of ocean beach had been required as a condition of a CAFRA development permit.[10]

From the summer of 1996 to May 4, 2004, Atlantis charged unregulated membership fees in varying amounts for access to and use of its beach. During the 2003 season, new members (and members who joined in 2002) paid $700 and received eight beach tags per household. In violation of the La Vida CAFRA permit, in the summer of 2003 Atlantis removed the public beach access sign at the western end of the Raleigh Avenue pathway extension and replaced it with a sign that read "FREE ACCESS TO GATE ONLY." The gate was located at the end of the pathway at the bulkhead. Later that summer, contradictory signs at the gate read "PUBLIC BEACH ACCESS" and "PUBLIC ACCESS ENDS HERE/MEMBERSHIP AVAILABLE AT GATE." The La Vida permit, however, required

> a landscaped public access pathway from the project site entrance down the center of Raleigh Avenue, and, according to the EIS and original site plan, a timber walkway over the bulkhead to the beach.

The permit stated:

> Although this accessway is minimal, it is considered adequate due to the small scale of this project. Public parking has not been lost at this site . . . and on-street parking is available to the public on surrounding roads. The proposed pathway and walkover will provide reasonable access to the beach, provided public access signs (available from the [DEP]) are conspicuously located at the end of Raleigh Avenue pavement. Therefore, as a condition of this permit, within 30 days of issuance, submit for review and approval a site plan specifically showing the proposed location and detail of the public walkover structure, and the proposed location of public access signage (a 1' × 2' metal sign available from the [DEP] on a

---

[10] The dissent considers any reliance on the conditions of La Vida's 1986 CAFRA permit by the Court to be improper because the DEP has not issued a notice of violation to Atlantis for failure to allow public use of its beach, because the language in the permit is "ambiguous," and "because the parties did not brief this issue." *Post* at 66–67, 879 A.2d at 128. We observe only that the permit was part of the record submitted to the Court, and that no party has disavowed its submission. In the circumstances, it would be improper to ignore the implications of the permit language.

standard metal signpost supplied by applicant), and construct the accessway improvements in accordance with the approved plan prior to occupancy of the structure. Maintenance and/or reconstruction of this walkway shall be the responsibility of the Homeowner's Association for the life of this project.

On the one hand, guards hired by Atlantis have asked non-members to leave the beach, and violators have been prosecuted by Atlantis in municipal court. On the other hand, the DEP has issued notices of violation both to La Vida and to Atlantis because of the signage infractions, because a section of the dunes was destroyed by the Beach Club, and because structures were erected on the beach without CAFRA approval.

The private beach property held by Atlantis is an area of undeveloped upland sand and dunes at the end of a street in a town that does not have public beaches. The owner, after years of public access and use, and despite a condition in the La Vida permit providing for access and, arguably use, decided in 1996 to engage in a commercial enterprise—a private beach club—that kept the public from the beach. Atlantis recognizes that as a "place of public accommodation," *N.J.S.A.* 10:5–51, under the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42, it must provide membership opportunities to the general public without regard to race, creed, or color, *Clover Hill Swimming Club v. Goldsboro,* 47 *N.J.* 25, 33–35, 219 *A.*2d 161 (1966). *See N.J.A.C.* 7:7E–8:11(b)(5) (requiring "establishments . . . [that] control access to tidal waters [to] comply with the Law Against Discrimination"). The Beach Club nonetheless asserts that it will lose one of the "sticks" in its bundle of property rights if it cannot charge whatever the market will bear, and, in setting fees for membership, decide who can come onto its property and use its beach and other services (lifeguards, trash removal, organized activities, etc.). But exclusivity of use, in the context here, has long been subject to the strictures of the public trust doctrine.

In sum, based on the circumstances in this case and on application of the *Matthews* factors, we hold that the Atlantis upland sands must be available for use by the general public under the public trust doctrine. In so holding we highlight the longstanding

public access to and use of the beach, the La Vida CAFRA permit condition, the documented public demand, the lack of publicly-owned beaches in Lower Township, and the type of use by the current owner as a business enterprise. We also adopt the construct put forward by the Appellate Division in connection with an appropriate fee structure for use of the beach by the public. That issue, however, requires further discussion.

## V.

As noted by the Appellate Division, Atlantis is willing to "extend[ ], without fee, its lifeguard services to members of the public who use the ocean but do not remain on its property." *Raleigh Ave., supra,* 370 *N.J.Super.* at 189, 851 *A.*2d 19. Although Atlantis claims that the DEP lacks jurisdiction to approve any fees charged by the Beach Club for its other services, the panel rejected that claim:

> CAFRA was enacted by the Legislature in 1973. *In re Egg Harbor Assocs.,* 94 *N.J.* 358, 362 [464 *A.*2d 1115] (1983). Although CAFRA is primarily an environmental protection statute, "the powers delegated to DEP extend well beyond protection of the natural environment." *Id.* at 364 [464 *A.*2d 1115]. Specifically, CAFRA delegates powers to the DEP and requires it to adopt rules and regulations governing land use within the coastal zone "for the general welfare." *Ibid.* The [L]egislature amended CAFRA in 1993, significantly expanding its jurisdiction. *In re Protest of Coastal Permit Program Rules,* 354 *N.J.Super.* 293, 310 [807 *A.*2d 198] (App.Div.2002).
>
> [*Id.* at 190, 851 *A.*2d 19.]

More specifically, CAFRA regulates activities in the coastal zone by requiring developers/property owners to obtain a permit from the DEP before undertaking "the construction, relocation, or enlargement of any building or structure and all site preparation therefore, the grading, excavation or filling on beaches or dunes, . . . includ[ing] residential development, commercial development, industrial development, and public development." *N.J.S.A.* 13:19-3; *see Protest of Coastal Permit Program Rules, supra,* 354 *N.J.Super.* at 310, 807 *A.*2d 198 (citing *N.J.S.A.* 13:19-5, 19-5.2, 19-5.3).

The DEP exercises its statutory authority under CAFRA through the Coastal Permit Program Rules, *N.J.A.C.* 7:7–1.1 to – 10.6, and the Coastal Zone Management Rules, *N.J.A.C.* 7:7E–1.1 to –8.22; *see Protest of Coastal Permit Program Rules, supra,* 354 *N.J.Super.* at 312, 807 *A.*2d 198. The Coastal Permit Program Rules directly address permitting requirements for "[a]ny development located on a beach or dune." *N.J.A.C.* 7:7–2.1(a)(1). Such development, which consists of dune walk-over and boardwalk structures, is regulated by *N.J.A.C.* 7:7E–3A.1 to –3A.5; *see N.J.A.C.* 7:7E–3A.5 (providing standards for construction of boardwalks) and *N.J.A.C.* 7:7E–3A.4 (providing standards for dune creation and maintenance). Pertinent to this case, "[d]une creation and maintenance includes the . . . maintenance and clearing of beach access pathways less than eight feet in width, and the construction or repair of approved dune walkover structures." *N.J.A.C.* 7:7E–3A.4(a).

We agree with the Appellate Division that the boardwalk pathway over the dunes to the Atlantis beach qualifies as a development, thereby triggering the DEP's CAFRA jurisdiction over related use of the beach and ocean. *See Raleigh Ave., supra,* 370 *N.J.Super.* at 191, 851 *A.*2d 19. We find jurisdiction also in the DEP's general "power to promote the health, safety, and welfare of the public." *In re Egg Harbor Assocs., supra,* 94 *N.J.* at 372, 464 *A.*2d 1115. We hold that the broad scope of the DEP's authority includes jurisdiction to review fees proposed by Atlantis for use of its beach. We expect that the DEP will use *N.J.A.C.* 7:7E–8.11(b)4, which limits fees at publicly-owned beaches to an amount "required to operate and maintain the facility" as a guide, and that fees will not be approved if they operate to "[l]imit access by placing an unreasonable economic burden on the public." *Raleigh Ave., supra,* 370 *N.J.Super.* at 193, 851 *A.*2d 19. Finally, we approve the approach taken by the Appellate Division wherein the panel recognized that Atlantis, as a private entity, should be allowed to include expenses actually incurred for reasonable management services (in addition to reimbursement for other costs) in

the fee calculation. *Ibid.* We add only that DEP-approved fees are unrelated to the independent and inherent right of Atlantis to provide cabanas for rent,[11] at a rate determined by the Beach Club and after obtaining a permit to construct or place such buildings on its property, or to engage in other similar business enterprises for profit, *e.g.*, beach chair rentals, food concessions, etc.

## VI.

For the reasons expressed in this opinion, the decision of the Appellate Division is affirmed.

Justice WALLACE, JR., dissenting.

I would reverse and reinstate the judgment of the trial court granting access to the ocean and an easement across the private sand area owned by the Atlantic Beach Club to access the beach at Seapointe. However, because a three-foot-wide strip would not easily allow for an adult and child to walk within that limited area, I would expand the horizontal access across defendant's property to a ten-foot-wide strip above the high water mark.

## I.

As the majority opinion makes clear, this Court has not previously defined the rights that the public has to privately-owned beaches. Because "it has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit[,]" *Phillips Petroleum Co. v. Mississippi*, 484 *U.S.* 469, 475, 108 *S.Ct.* 791, 794–95, 98 *L.Ed.*2d 877 (1988), the lands subject to the public trust doctrine are to be determined by each State.

---

[11] We note that Atlantis represented in its reply brief that "additional amenities," including cabanas, were available for rent on the beach for the 2004 season.

New Jersey was the first state to recognize and apply the public trust doctrine:

> The public trust doctrine is the legal principle that the submerged lands and waters below mean highwater mark are owned by the state government in trust for public uses such as transportation and fishing. In 1821 the New Jersey Supreme Court was the first in the United States to verify its application in the New World, in *Arnold v. Mundy* [, 6 *N.J.L.* 1 (1821) ]; in 1842 the U.S. Supreme Court reaffirmed that court's ruling in *Martin v. Waddell*['s Lessee, 41 U.S. 367, 16 Pet. 367, 10 L.Ed. 997 (1842) ]. Both came about because of conflicts over rights to oyster grounds in the Raritan River and Bay. . . . The outcome was recognition of the state's ownership as trustee for the people of the state. Subsequently, the doctrine has played important roles in waterfront development, uses and management of . . . wetlands, and public access to riverfronts and beaches.
>
> [*Encyclopedia of New Jersey* 665–66 (Maxine N. Lurie & Marc Mappen eds., 2004).]

We have interpreted the public trust doctrine to require broad public access to those lands that are held in public trust. *Borough of Neptune City v. Borough of Avon–by–the–Sea*, 61 *N.J.* 296, 308–09, 294 *A.*2d 47 (1972) (noting that public trust doctrine dictates that when municipality owns upland sand, beach and ocean must be available on equal terms to entire public); *Van Ness v. Borough of Deal*, 78 *N.J.* 174, 179–80, 393 *A.*2d 571 (1978) (noting that public trust doctrine requires that public have use and enjoyment of beaches owned by municipality). In *Neptune City, supra*, we recognized that "[t]he public trust doctrine . . . should be molded and extended to meet changing conditions and needs of the public it was created to benefit." 61 *N.J.* at 309, 294 *A.*2d 47.

A.

We addressed for the first time the extent of the public's interest in privately-owned dry sand beaches in *Matthews v. Bay Head Improvement Ass'n*, 95 *N.J.* 306, 471 *A.*2d 355, *cert. denied*, 469 *U.S.* 821, 105 *S.Ct.* 93, 83 *L.Ed.*2d 39 (1984). The key issue in that case was whether the public has the right of access to tidal lands through privately-owned dry sands. *Id.* at 312, 471 *A.*2d 355. The municipality did not own any of the dry land. *Ibid.* Because the Bay Head Improvement Association (Improvement Association) either owned or leased the beachfront parcels so that

its members had access to Bay Head's one-and-one-quarter mile beachfront, the public could not access the ocean through the dry sand. *Id.* at 314–15, 471 *A.*2d 355. The plaintiffs filed suit seeking the right of access to the beaches in Bay Head as public trust lands, and the right to use private property fronting on the ocean incidental to the public's right under the public trust doctrine. *Id.* at 312–13, 471 *A.*2d 355. The trial court granted summary judgment in favor of the defendant and dismissed the complaint. *Id.* at 313, 471 *A.*2d 355. The Appellate Division affirmed with one judge dissenting. The plaintiff appealed as of right, *Rule* 2:2–1(a), and we granted the plaintiff's petition for certification. *Ibid.*

Initially, we reviewed the development of the public trust doctrine. In describing the public's right of entry to the water, we explained that "[t]he test is whether those means are reasonably satisfactory so that the public's right to use the beachfront can be satisfied." *Id.* at 325, 471 *A.*2d 355. We found that the public cannot reasonably enjoy the ocean unless there is also available the use of the dry sand to rest and relax. *Ibid.* We concluded that "where use of dry sand is essential or reasonably necessary for enjoyment of the ocean, the doctrine warrants the public's use of the upland dry sand area subject to an accommodation of the interests of the owner." *Ibid.* (footnote omitted). We emphasized that each particular circumstance will determine "[p]recisely what privately-owned upland sand area will be available and required to satisfy the public's rights under the public trust doctrine[.]" *Id.* at 326, 471 *A.*2d 355. In striking a fair balance between the rights of the public and the interests of the private owner, we listed the following factors that should be considered: (1) the location of the dry sand in relation to the foreshore; (2) the extent and availability of publicly-owned beaches; (3) the nature and extent of the public demand; and (4) the owner's usage of the dry sand area. *Ibid.*

In applying those factors, we first noted that the Improvement Association was a quasi-public organization whose activities "paral-

leled those of a municipality." *Id.* at 330, 471 *A.*2d 355. Next, we found that there was no publicly-owned beach and that the Improvement Association's limited membership to the residents prevented the public from enjoying the beach and ocean. *Id.* at 331, 471 *A.*2d 355. Consequently, we concluded that the record demonstrated "that a right of access to the beach ... as well as the right to use the Association's upland dry sand[ ]" area was required. *Id.* at 333, 471 *A.*2d 355.

Thus, in *Matthews,* the entirety of the beach was privately-owned, but by a quasi-public organization. Even though we held that those circumstances dictated that the public have reasonable access to the ocean and the use of privately-owned dry sand beach, we recognized that each case must be decided "upon the specific facts in controversy." *Ibid.*

### B.

This case requires us to apply the *Matthews* test in evaluating the competing interests of the public to reasonable access and use of the ocean and dry beach against the interests of the private landowner to use and enjoy its land. The first factor of the *Matthews* test, the location of the dry sand area in relation to the foreshore, weighs in favor of plaintiff. The dry sand area of the Beach Club is directly adjacent to the wet sand and ocean and there are no barriers or structures creating any division between the two areas. Further, there is no direct access to the water except over the Beach Club property. In fact, defendant concedes that access to the ocean may be over its privately-owned property, and that the public has the right to use its property "at and below the mean high water line."

The second factor, the extent and availability of publicly-owned upland sand area, weighs in favor of defendant. The evidence shows that Seapointe is adjacent to the Beach Club and that Seapointe allows the public access and use of its beach. Thus, there is a beach in close proximity to the Beach Club that will

permit the public to enjoy the beach without interfering with the rights of a private beach owner.

The third factor, the nature and extent of public demand, weighs in favor of plaintiff, at least with regard to access. There are a large number of multi-story condominium buildings in the Diamond Beach neighborhood adjacent to the Beach Club property that were constructed on land sold to the developers by one of defendant's principals. The numerous residents of those buildings seek to use the ocean. Thus, there is a public demand for reasonable access across the Beach Club's private property.

The final factor is the usage of the upland sand by the owner. Defendant uses its beach as a private-for-profit beach club, and offers two types of memberships, an annual membership and a lifetime easement. In 2003, the annual membership fee was $700 and the lifetime easement fee was $10,000. Defendant provides its members with security, beach maintenance, lifeguards, and some recreational activities. The only improvement on the land is the boardwalk. Therefore, I find that this factor weighs in favor of defendant.

The majority opinion discusses the La Vida CAFRA permit and concludes from its language that "it may be inferred from this section of the permit that open access and use was ceded to the public by La Vida." *Ante* at 58, 879 *A.2d* at 123. It recognizes, however, that none of the parties make this argument and concludes that "we, therefore, will not here consider the permit dispositive on the issue of public use." *Ibid.* The majority also notes that the DEP has noticed La Vida and the Beach Club for signage infractions, dune destruction, and improper erection of structures on the beach. *Id.* at 58, 879 *A.2d* at 123. Tellingly, the DEP has not issued a notice of violation to the Beach Club for failure to allow the public to use its beach. Irrespective of that, the majority, in part, relies on the La Vida CAFRA permit conditions to conclude that the public trust doctrine should be expanded to make the upland sands of the Beach Club available to the general public. The Court, however, should not consider the

La Vida CAFRA permit because of its ambiguous language. Unlike the La Vida permit, the 1987 CAFRA permit for the adjacent Seapointe property development made clear that the beach in front of Seapointe was required to be open to the public. Most importantly, because the parties did not brief this issue, I do not consider the conditions of the La Vida CAFRA permit in my discussion.

In balancing the above factors, it is obvious that the greater weight favors access to the ocean and the use of the water below the mean high water mark. Defendant recognizes and concedes that plaintiff has a right of access over its land and the use of the ocean. However, because there is an adjacent beach to defendant's private property that is available to the public, I find no need to apply the public trust doctrine beyond access to the ocean and access to a reasonable area across defendant's property to the adjacent Seapointe. In my view, that strikes a proper balance between the public trust doctrine, which requires reasonable access and use of the ocean and beaches, and a private owner's right to use its private property as it deems fit. The record here amply supports the conclusion that access to the water and to Seapointe over defendant's privately-owned beachfront will reasonably satisfy the public need at this time. I see no justification to exceed that minor intrusion.

## II.

I agree with the position of the State before the trial court that the three-foot access across defendant's land to Seapointe was insufficient and that the public was entitled to unrestricted use of a reasonable area of dry sand, "which [the State] considers to be an area at least 10 feet wide above the mean high water line." In my view, ten feet is a reasonable area for a family to safely traverse defendant's property to reach Seapointe without excessively impinging on defendant's property rights. Moreover, for those members of the public who elect to use the beach and ocean at that location, the ten-foot area will also give them limited use of

the beach. Under the circumstances of this case, that is the only reasonable accommodation that we should require to enforce the public trust doctrine.

Justice RIVERA–SOTO joins in this opinion.

*For affirmance*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, and ALBIN—5.

*For reversal and reinstatement*—Justices WALLACE and RIVERA–SOTO—2.